# EXHIBIT B

**FILED**
Filed - David Combs
- 1/26/2017 David
Combs 1/26/2017
3:18:43 PM
County Clerk
Genesee County

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR GENESEE COUNTY**

LAWRENCE WASHINGTON JR., individually and as next
friend of five minor children, TAYLOR WASHINGTON,
MORGAN WASHINGTON, CHLOE WASHINGTON,
MADISON WASHINGTON, LAWRENCE WASHINGTON;
AARON SWINGER; ANGELA WAY; CONNIE MCNEAL,
all on behalf of themselves and a class of all others similarly
situated, et al.,

)
)
)
)
)
)
)
)

Case No. ___17-108488-NO___

Hon. ___YUILLE___

      *Plaintiffs,*

)
)
)
)

**CLASS ACTION**
**COMPLAINT**

      - against -

)
)

**JURY TRIAL DEMANDED**

GOVERNOR RICHARD DALE SNYDER, DENNIS
MUCHMORE, in their individual and official capacities,
ANDREW "ANDY" DILLON, R. KEVIN CLINTON,
DANIEL WYANT, NICK LYON, in their individual
capacities, LIANE SHEKTER SMITH, STEPHEN BUSCH,
PATRICK COOK, MICHAEL PRYSBY, BRADLEY
WURFEL, MIKE BROWN, ED KURTZ, DARNELL
EARLEY, GERALD AMBROSE, DAYNE WALLING,
HOWARD CROFT, MICHAEL GLASGOW, DANIEL
WYANT, LIANE SHEKTER SMITH, STEPHEN BUSCH,
PATRICK COOK, MICHAEL PRYSBY, BRADLEY
WURFEL, EDEN WELLS, LINDA DYKEMA, NANCY
PEELER, ROBERT SCOTT, in their individual and official
capacities, ROWE PROFESSIONAL SERVICE COMPANY,
a Michigan Corporation, LOCKWOOD, ANDREWS &
NEWNAM, INC. a Texas Corporation, LOCKWOOD,
ANDREWS, & NEWNAM P.C., a Michigan Corporation, LEO
A DALY, a Nebraska Corporation, VEOLIA NORTH
AMERICA, INC., a Delaware Corporation VEOLIA NORTH
AMERICA, LLC., a Delaware limited liability company,
VEOLIA NORTH AMERICA OPERATING SERVICES,
LLC, a Delaware limited liability company, EACH, a wholly
owned subsidiary of VEOLIA ENVIRONNEMENT S.A., a
French transnational Company, and the CITY OF FLINT, a
municipal corporation, jointly and severally.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

      Jointly and Severally,

)
)

      *Defendants.*

)
)
)

1

| | |
|---|---|
| **Excolo Law, PLLC** | **Marc J. Bern & Partners, LLP** |
| Solomon M. Radner (P73653) | Chet Kern (SBN 1989540) |
| *Attorneys for Plaintiffs* | *(Pro Hac Vice Admission Pending)* |
| 26700 Lahser Rd, Suite 401 | *Attorneys for Plaintiffs* |
| Southfield, MI 48033 | 60 East 42ND Street, Suite 950 |
| T: 866.939.2656 | New York, NY 10165 |
| F: 248.436.6858 | T: 212.702.5000 |
| sradner@excololaw.com | F: 212.818.0164 |

Pending actions:

*IN RE: FLINT WATER LITIGATION*

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION, DECLARATORY JUDGMENT, AND DAMAGES

NOW COMES Plaintiffs LAWRENCE WASHINGTON JR., individually and as next friend of five minor children, TAYLOR WASHINGTON, MORGAN WASHINGTON, CHLOE WASHINGTON, MADISON WASHINGTON, LAWRENCE WASHINGTON; AARON SWINGER; ANGELA WAY; CONNIE MCNEAL, all on behalf of themselves and a class of all others similarly situated, by and through their attorneys Ari Kresch and Solomon M. Radner of Excolo Law, PLLC, complain of the defendants as follows:

## INTRODUCTION

1.  This class action is brought on behalf of the tens of thousands citizens of the City of Flint who are water users, which include but is not limited to, the residents of the City of Flint who from April 25, 2014 to the present, have experienced and will continue to experience serious personal injuries, loss of business, and property damage caused by the employees of the City of Flint, Employees of the State of Michigan who were:

i.   Grossly negligent in making or approving the April 25, 2014 decision to substitute safe water supplied by the City of Detroit (DWSD System) with highly corrosive, dangerous, unpotable, and unsafe drinking water from the Flint River; and

ii.  Grossly negligent in monitoring the lead levels of the Flint River water coming out of individual taps of Flint homes, residence, schools, hospitals, and other public place; as well as the blood lead levels of Flint's children who were exposed to Flint River water after the April 25,2014 switch from the DWSD to the Flint River as a source of primary drinking water; and

iii. Acting in bad faith by falsely assuring Flint water users for many months that the Flint River Water was safe to use and consume, when Defendants knew or had reason to believe that these assurances were in fact false; and

iv.  Through their actions caused a battery because each defendant without the consent of the plaintiffs or plaintiffs class, put into motion a known harmful toxic substance (untreated Flint River Water) and it was substantially certain that Plaintiffs would be harmed in their person by exposure to said toxic and harmful substance; and

v.   Causing intentional infliction of emotional distress on the residents of Flint through their outrageous, intentional, and reckless conduct; and

vi.  Breaching of a UCC contract with the residents of Flint, including the plaintiffs herein, by failing to perform and fulfill their obligations under the contract as well as failing to distribute water that complied with the implied and express warranties referenced herein; and

3

       vii.   Perpetuating a fraud and silent fraud on the plaintiffs.

2.    This class action is also brought against LAN and LEO A DALY Corp., Rowe Professional Services, and Veolia who were:

       i.   Professionally Negligent in the fact that they did not act with the reasonable care of a professional engineering firm and breach their duty owed to the flint residents which was the proximate cause of the Plaintiffs and Plaintiff class' foreseeable injuries; and

       ii.   Grossly negligent in making or facilitating and perpetuating the continued connection to the Flint River - the April 25, 2014 decision to substitute safe water supplied by the City of Detroit (DWSD System) with highly corrosive, dangerous, unpotable, and unsafe drinking water from the Flint River; and

       iii.   Grossly negligent in monitoring the lead levels of the Flint River water coming out of individual taps of Flint homes, residence, schools, hospitals, and other public place; as well as the blood lead levels of Flint's children; and by perpetuating the water crisis and exposure and re-exposure to the toxic and dangerous Flint River water after the April 25,2014 switch from the DWSD to the Flint River as a source of primary drinking water; and

       iv.   Acting in bad faith by falsely assuring, and reassuring and making continual misrepresentations, to Flint water users for many months that the Flint River Water was safe to use and consume, when Defendants knew or had reason to believe that these assurances were in fact false, of which the citizens of Flint justifiably relied upon to their detriment (See List containing all

presently known affirmative misrepresentations, omissions, and the declarant thereof attached herein as **Exhibit B**); and

v.  Through their actions caused battery because each defendant without the consent of the plaintiffs or plaintiffs class, put into motion a known harmful toxic substance (untreated Flint River Water) and it was substantially certain that Plaintiffs would be harmed in their person by exposure to said toxic and harmful substance; and

vi.  Causing intentional infliction of emotional distress, on the residents of Flint through their outrageous, intentional, and reckless conduct; and

vii.  Perpetuating a fraud and silent fraud on the plaintiffs.

3.  The defendants named in this action are current or former employees of the State of Michigan ("State") and/or the City of Flint ('Flint"), and the Engineering firms, all of which were responsible in making, approving and advising the decision to switch water sources from the DWSD to the Flint River and/or were required to monitor water lead levels after the switch and connection to the Flint River; and who were required to implement corrosion control treatments to the Flint River water before it reached the Flint residents for consumption and use after corroding lead pipes; or who, in bad faith, assured Flint water users that the Flint River water was safe to consume and use when they knew or were on actual notice and should have reason to know that the water was dangerous, corrosive, unpotable and unfit for human consumption and use.

4.  The individual defendants and the engineering defendants named herein ignored and manipulated falsified and discredited evidence (including expert evidence) pointing to

the fact that the Flint River water was highly corrosive and unfit and dangerous for human consumption and use.

5.    The Defendants were on actual notice of the highly corrosive nature of the Flint River water and could never be made safe and the Flint Water Treatment Plant required extensive upgrades and inspections before they would be able to proceed with its use as a primary source of drinking water.

## PLAINTIFFS

6.    Plaintiff Class representatives are citizens of the United States and at all relevant times were present in Flint, and include - individuals, home owners, business owners, visitors, to The City of Flint, parents and minors, and prisoners - who, since April 25, 2014, were and continue to be injured in person and property because they were exposed and re-exposed to highly dangerous conditions created, caused and knowingly prolonged by Defendants' systematic and coordinated conduct. The Plaintiffs were therefore injured as a result of the Defendants' affirmative actions, which caused and perpetuated the public health crisis known nationally as the "Flint Water Crisis", by acting with a depraved indifference by failing to protect the health, safety, and welfare of the residents of the City of Flint. (See full list of Clients annexed to this Complaint as **EXHIBIT A)**

7.    The plaintiffs' homes, as well as schools, hospitals, businesses, correctional facilities, workplaces and public places throughout the City of Flint were contaminated and re-contaminated with lead and other toxic compounds as a result of Defendants'

6

financially motivated decision to disconnect from the safe DWSD in favor of the toxic yet free Flint River. The use of the Flint River as the interim water source was well known to the Defendants as reckless and dangerous through the many paid for expert feasibility studies produced by the named engineering firm Defendants, and findings by MDEQ and the State requiring extensive upgrades to the City of Flint's outdated and worn facilities, infrastructure, and water treatment plant before any safe connection to the Flint River could be contemplated.

8.     Plaintiffs bring this action on behalf of themselves and others constituting a Class of individuals who sustained personal and/or property injury after April 25, 2014, because of their exposure and re-exposure to the toxic but free Flint River or who were injured as a result of Defendants' systematic and coordinated actions to fraudulently and continuously conceal and misrepresent the safety of the Flint River with a depraved indifference to the public health crisis they created and failed to mitigate despite having prior knowledge of problems with the water and which information was justifiably relied upon by the resident/Plaintiffs of the City of Flint to their detriment.

9.     There are four groups of Plaintiffs that have asserted claims in this complaint. These groups of claimants include (1) Claims by infants that suffered bodily harm as a result of the occurrence complained of herein (2) Claims by Adults that were suffered bodily harm as a result of the occurrence complained of herein (3) Claims by business owners that have suffered economic losses as a result of the occurrence complained of herein; and (4) Claims by property owners who have suffered the loss of or extensive damage to their properties and businesses as a result of the occurrence complained of herein. (See full list of Clients annexed to this Complaint as **EXHIBIT A**)

10.    Plaintiff Lawrence Washington Jr. is father to 5 infants that represents the class of infants asserting claims for personal injuries and bodily harm suffered as a result of the occurrence complained of by way of this complaint. Plaintiff Lawrence Washington Jr. represents the class of all others similarly situated, a complete list of infant plaintiffs asserting claims raising personal injuries and bodily harm suffered as a result of the occurrence complained of herein is attached hereto as Exhibit A.

11.    Plaintiff Aaron Swinger is an adult that represents the class of adults for personal injuries and bodily harm suffered as a result of the occurrence complained of by way of this complaint herein. Plaintiff Aaron Swinger represents the class of all others similarly situated, a complete list of adult plaintiffs asserting claims raising personal injuries and bodily harm suffered as a result of the occurrence complained of herein is attached herein as Exhibit A.

12.    Plaintiff Connie McNeal is a business owner in the City of Flint that has suffered economic damages as a result of the occurrence complained of herein, and represents the class of business owners that have suffered same. Plaintiff Connie McNeal represents the class of all others similarly situated; a list detailing all plaintiffs asserting claims for loss of business income herein is attached as Exhibit A.

13.    Plaintiff Angela Way is a property owner in the City of Flint that has suffered the loss, damage to, and the taking of property as a result of the occurrence complained of herein. Plaintiff Angela Way represents the class of all others similarly situated, and a list of all plaintiff's asserting claims for the loss, damage to, and the taking of their property is attached herein as Exhibit A.

**DEFENDANTS**

14.   Defendants are named and described in the caption of this action.

15.   Defendant Richard Dale Snyder ("Snyder") is the Governor of the State of Michigan, and is sued in his individual and official capacity.

16.   Snyder was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.

17.   Defendant Andrew "Andy" Dillon ("Dillon") was the former Treasurer of the State of Michigan from 2011 to 2013, after which he served in an advisory capacity to the subsequent Michigan State Treasurer, R. Kevin Clinton.  He is sued in his individual capacity.

18.   Dillon was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.

19.   Defendant R. Kevin Clinton ("Clinton") was the former Treasurer of the State of Michigan subsequent to Defendant Dillon, and is sued in his individual capacity.

20.   Clinton was at all times relevant herein acting within and outside of the scope of his employment and/or authority under color of law.

21.   Defendant Dennis Muchmore ("Muchmore") was Snyder's Chief of Staff, and is sued in his individual and official capacity.

22.   Defendants Mike Brown, Ed Kurtz, Darnell Earley, and Gerald Ambrose ("Emergency Managers") at all times relevant herein were acting within and outside the scope of their employment and/or authority under color of law.

23.   The Emergency Managers are sued in their individual and official capacities.

9

24.     Defendant Emergency Managers, who were controlled by and reporting to the State of
        Michigan, controlled by the State of Michigan and reporting continuously controlled
        all of the Flint governmental functions, decisions and fiscal decisions from December
        2011 through April 30, 2015 pursuant to Statute and reported to Snyder, Dillon and
        Clinton.

25.     Defendant City of Flint is a municipal corporation located in Genesee County,
        Michigan.

26.     Defendant Dayne Walling ("Walling") was the elected mayor of the City of Flint during
        all relevant herein periods.

27.     Walling was at all relevant times herein acting within and outside the scope of his
        employment and/or authority under color of law.

28.     Walling sued in his individual and official capacity.

29.     Defendant Howard Croft ("Croft") was at all relevant times herein Flint's Department
        of Public Works Director acting within and outside the scope of his employment and/or
        authority under color of law.

30.     Croft is sued in his individual and official capacities.

31.     Defendant Michael Glasgow ("Glasgow") was at all relevant times herein a water
        treatment plant operator for the City of Flint acting within and outside the scope of his
        employment and/or authority under color of law.

32.     Glasgow is sued in his individual and official capacities.

33.     Defendant Daniel Wyant ("Wyant") was at all relevant times herein the Director of
        MDEQ until Snyder accepted his resignation on or about December 29, 2015.

34.   Wyant was acting within and outside the scope of his employment and/or authority under color of law.

35.   Wyant is sued in his individual capacity.

36.   Defendant Liane Shekter Smith ("Shekter Smith") was at all relevant times herein Chief of the Office of Drinking Water and Municipal Assistance for MDEQ.

37.   At all relevant times Shekter Smith acted within and outside the scope of her employment, and/or authority under color of law.

38.   Shekter Smith is sued in her individual and official capacity.

39.   Shekter Smith was removed from her position on October 19, 2015.

40.   Defendant Stephen Busch ("Busch") was at all relevant times herein the District Supervisor assigned to the Lansing District Office of the MDEQ.

41.   At all relevant times Busch was acting within and outside the scope of his employment and/or authority under color of law.

42.   Busch is sued in his individual and official capacity.

43.   Defendant Patrick Cook ("Cook") was at all relevant times herein Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ.

44.   At all relevant times Cook was acting within and outside the scope of his employment and/or authority under color of law.

45.   Cook is sued in his individual and official capacity.

46.   Defendant Michael Prysby ("Prysby") was at all relevant times herein the MDEQ Engineer assigned to District 11 (Genesee County).

47.   Prysby was acting within and outside the scope of his employment and/or authority.

48.   Prysby is sued in his individual and official capacity.

49.     Defendant Bradley Wurfel ("Wurfel") was at all relevant times herein the Director of Communications for MDEQ.

50.     At all relevant times Wurfel was acting within and outside the scope of his employment and/or authority under color of law.

51.     Wurfel resigned from his position on December 29, 2015.

52.     Wurfel is sued in his individual and official capacity.

53.     Defendant Eden Wells ("Wells"), was at all relevant times herein Chief Medical Executive within the Population Health and Community Services Department of the MDHHS.

54.     At all relevant times Wells was acting within and outside the scope of her employment and/or authority under color of law.

55.     Wells is sued in her individual and official capacity.

56.     Defendant Nick Lyon was at all relevant times herein Director of MDHHS.

57.     At all relevant times herein, Lyon was acting within and outside the scope of his employment and/or authority under color of law.

58.     Lyon is sued in his individual capacity.

59.     Defendant Linda Dykema ("Dykema"), was director of the MDHHS Division of Environmental Health.

60.     At all times relevant herein Dykema was acting within and outside her scope of employment and color of authority.

61.     Dykema is sued in her individual and official capacity.

62.     Defendant Nancy Peeler ("Peeler") was at all relevant times herein a MDHHS employee in charge of its childhood lead poisoning prevention program.

63. At all relevant times herein Peeler was acting within and outside the scope of her employment and/or authority under color of law.

64. Peeler is sued in her individual and official capacity.

65. Defendant Robert Scott ("Scott") was, at all relevant times herein, Data Manager for MDHHS's Healthy Homes and Lead Prevention Program.

66. At all relevant times herein Scott was acting within and outside the scope of his employment and/or authority under color of law.

67. Scott is sued in his individual and official capacity.

68. Defendant Veolia North America, Inc. is a Delaware corporation with its principal place of business in Illinois.

69. Defendant Veolia North America LLC., is a Delaware limited liability company with its principal place of business in Illinois.

70. Defendant Veolia North America Operating Services LLC., is a Delaware is a limited liability company with its principal place of business in Indiana.

71. All the United States Veolia entities are wholly owned subsidiaries of Veolia Environnement S.A. ("Veolia").

72. Veolia, at all relevant times herein based on testing, examinations, finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendered its professional expert opinion as to the safety of the continued use of and confirmed safe continuous use of untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

13

73.    Veolia maintains an office in the city of Westland, Wayne County, Michigan, transacts business in the State of Michigan, including the business it performed for the City of Flint in 2015, and has committed a tort in the State of Michigan, among bases for personal jurisdiction under MCL 600.705. Each of these bases extends to this District specifically.

74.    Defendant Rowe f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan Corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

75.    Rowe at all relevant times herein based on its testing, examinations finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendering its professional expert opinion as to the safety of the continued use and confirmed safe continuous use of untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

76.    Rowe maintains an office in Flint, Genesee County, Michigan; regularly conducts business in Flint, Michigan; and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

77.    Defendant Lockwood, Andrews, Newnam, Inc. and Lockwood, Andrews, Newnam, P.C. ("LAN"), is a wholly owned subsidiary of Leo A. Daly ("Daly").

78.    LAN, Inc., is a Texas corporation with its principal place of business in Texas.

79.    LAN, P.C., is a Michigan corporation with its principal place of business in Michigan.

80.    LEO A. Daly, Inc. is a Nebraska corporation and the parent corporation of LAN, Inc. and LAN, P.C., parent company of LAN

14

81.   LAN, at all relevant times herein based on its testing, examinations, finding and reports as relates to the condition of the Flint River and the Flint water treatment plant, and rendering its professional expert opinion as to the continued use of and confirmed safe continuous use of untreated water, by declaring the water safe, despite no use of corrosion control, perpetuated the exposure and re exposure to lead, iron, and the destruction of the Flint water delivery infrastructure.

82.   LAN maintains an office in Flint, Genesee County, Michigan, regularly conducts business in the Eastern District of Michigan, and has committed a tort in the State of Michigan, among bases for personal jurisdiction under MCL 600.705, and each of these bases extends to this District specifically.

## JURISDICTION

83.   This court has subject matter jurisdiction over the claims asserted in this lawsuit because Plaintiffs seek compensation in an amount in excess of $25,000. The damages to this Class of Plaintiffs caused by Defendants' wrongful actions are in the 100's of millions of dollars or higher.

84.   The court has personal jurisdiction over each Defendant because the wrongful conduct alleged in this lawsuit occurred in the State of Michigan, County of Genesee, City of Flint.

## VENUE

85.   Venue is proper in this Court because the injuries and damages to Plaintiffs and Plaintiff Class occurred in Genesee County, Defendants reside or conduct business in

Genesee County, Plaintiffs reside, own property, or conduct business in Genesee County and many of the occurrences described herein occurred in Genesee County.

## STATEMENT OF FACTS

86. The City of Flint, located in Genesee County has for over 50 years received its water from Lake Huron through the DWSD System. For all this time the City of Flint has enjoyed the use and consumption of clean, potable, non-toxic water.

87. Since 1988, the State of Michigan has had some form of emergency management law for municipal financial crises.

88. Under Snyder's business-like approach to government, Michigan's emergency management regime has been aggressively strengthened and deployed.

89. In 2011, Governor Snyder signed Public Act 4 of 2011 ("PA 4") into law, strengthening the power provided to Emergency Financial Managers and changing their title to "Emergency Managers."

90. PA 4 allowed the State of Michigan to appoint an Emergency Manager to functionally replace the entirety of a municipal government where the state found a "Financial Emergency."

91. PA 4 was temporarily suspended after more than 200,000 signatures were collected in an effort to conduct a statewide referendum.

92. PA 4 was taken off of the books after the statewide referendum decided in favor of repealing it.

93. PA 4 was quickly replaced when Snyder signed Public Act 436 of 2012 ("PA 436") into law which was more powerful than the previous EM law.

94.   PA 436 provides local governments with a "choice" as to whether an Emergency
      Manager will be appointed.

95.   The local government may "choose" between a consent agreement, chapter 9
      bankruptcy, mediation, or an appointment of an Emergency Manager with similar broad
      powers Emergency Managers were given under PA 4, which was repealed.

96.   PA 436 forced Emergency Managers on the local government of Flint under the illusion
      of Flint's ability to determine their own governance. PA 436 is to "preserve the capacity
      of local units of government… to provide or cause to be provided necessary services
      essential to public health, safety, property and welfare[.]"

97.   PA 436 specifies that "[u]pon appointment, an emergency manager shall act for and in
      the place and stead of the governing body and the office of chief administrative officer
      of the local government." Emergency Manager Statute and MCL 141.1549(2).

98.   The Emergency Manager's mandate is to "assure . . . the local government's capacity to
      provide or cause to be provided necessary governmental services essential to the public
      health, safety, and welfare." Emergency Manager Statute and MCL 141.1549(2). This
      section of the Emergency Manager Statute contains no provision as to how this would
      be enforced.

99.   A PA 436 Emergency Manager "serve[s] at the pleasure of the governor." MCL
      141.1549(3) (d).

100.  At all times between December, 2011 and April 30, 2015, the City of Flint was under
      the control and authority of an Emergency Manager appointed by, and reported to the
      Governor, and State Treasurers.

101.   Michael Brown served Governor Snyder and Treasurer Dillon as Flint's Emergency
       Manager from December of 2011, until August of 2012.

102.   Ed Kurtz served Governor Snyder and Treasurer Dillon as Flint's Emergency Manager
       from August of 2012, until July of 2013.

103.   Michael Brown again served Governor Snyder and the State Treasurer as Flint's
       Emergency Manager from July of 2013, until October of 2013.

104.   Darnell Earley served Governor Snyder, and State Treasurer as Flint's Emergency
       Manager from October of 2013, until January of 2015.

105.   Gerald Ambrose served Governor Snyder, and the State Treasurer as Flint's Emergency
       Manager from January of 2015, until April 30, 2015.

**Decision to Switch to the Flint River**

106.   In 2011, the city of Flint commissioned a study to be done by Defendants LAN and
       Rowe on whether it would be feasible for the city of flint to switch off of the Lake Huron
       water being supplied by the DWSD onto the Flint River. Previous studies, such as the
       2004 Rowe and LAN feasibility study, had been commissioned before the 2011 study.
       there are other prior studies and Rowe also as they did joint safety and feasibility studies
       2004.

107.   The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011"
       ("2011 Report"), prepared by Rowe Professional Services and Lockwood, Andrews and
       Newman ("LAN") cautioned against the use of the Flint River, and the dormant Flint
       Water Treatment Plant ("WTP") would cost tens of millions of dollars to upgrade.

108. The Flint River in 2011, was then rejected as a primary water source for the City of Flint because the cost of repairs and upgrades to the Flint Water treatment plant would have been upwards of tens of millions of dollars.

109. It was proposed that the City of Flint should switch from the DWSD and onto the not yet constructed Karegondi Water Authority. Studies were commissioned to help aid in the decision to switch to the KWA or not.

110. On December 21, 2012, Tucker, Young, Jackson and Tull (TYJT) was commissioned by the treasury and made a presentation to the emergency manager of the City of Flint at the time, Defendant Kurtz, concluding that the KWA option should be rejected. In February, 2013, TYJT submitted their final report to Emergency Manager Kurtz.

111. Their overall conclusion was that the KWA option should rejected for the cheaper alternative of mixing DWSD water with Flint River water.

112. Emergency Managers in 2011, 2012, 2013, and 2014 also commissioned feasibility studies of the Flint River as a primary water supply that were created by Rowe Professional Services and LAN. These studies all pointed to the fact that the Flint River could not be used as a primary water source for the City of Flint without major upgrades and improvements to the Flint Water Treatment Plant.

113. Emergency Manager Kurtz hired Defendant Rowe Professional Services to review the TYJT report in January of 2013.

114. On January 7, 2013, Rowe reviewed and rejected the TYJT Report in their report entitled "Review of TYJT December 21, 2012 Presentation City of Flint Water Supply Assessment," and they also recommended choosing the KWA option.

115. On March 29, 2013, Emergency Manager Kurtz authorized the KWA deal for the City of Flint and rejected the DWSD option.

116. DWSD submitted a final counter offer that would have saved Flint/Genesee County roughly 50% immediately and 20% when compared to the KWA over 30 years.

117. Emergency Manager Kurtz again rejected the DWSD offer in favor of connecting to the KWA and reaffirming his rejection of the TYJT report.

118. Defendant Treasurer Dillon, thereby rejected the TYJT report he had commissioned, and rejected the DWSD offer, to ultimately accept and approve, on behalf of the State of Michigan, the recommendation of Defendant Emergency Manager Kurtz.

119. The KWA construction began in June 2013, and in April 2014, was when the City of Flint would ultimately disconnect from the DWSD and use the Flint River as a primary source of water until the KWA had finished construction and was operational. Flint River was a temporary water source for the interim period before the KWA was set to be operational.

120. On March 26, 2014, Busch e-mailed Shekter-Smith and another colleague the following: "One of the things we didn't get to today that I would like to make sure everyone is on the same page on is what Flint will be required to do in order to start using their plant full time. Because the plant is setup for emergency use, they could startup at any time, but starting up for continuous operation will carry significant changes in regulatory requirements so there is a very gray area as to what we consider for startup."

121. Michael Glasgow, the City of Flint's WTP's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that he was "expecting changes to our Water Quality Monitoring parameters, and possibly our Disinfection Byproduct monitoring on

lead & copper monitoring plan...Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible...I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water."

122.  The next day, Glasgow wrote to Prysby and Busch, noting that he "assumed there would be dramatic changes to our monitoring. I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

123.  An April 23, 2014 e-mail from Busch to MDEQ communications director, Bradley Wurfel, developed talking points for an upcoming Flint meeting that was scheduled to address the Flint River connection. Among the points made, Busch offered: "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

124.  On April 25, 2014, Flint officially began using the Flint River as a primary water source despite the fact that not all the proper preparations had been made. Flint Mayor Dayne Walling publically stated, "It's regular, good, pure drinking water, and it's right in our backyard."

125.   Defendant Croft in a press release regarding the switch to the Flint River stated, "[t]he test results have shown that our water is not only safe, but of the high quality that Flint Customers have come to expect. We are proud of that end result." Defendant Croft made this statement despite his knowledge of the concerns regarding the Flint Water Treatment Plants inadequate preparation and monitoring.

126.   The LAN and LEO defendants were hired to prepare the Flint Water Treatment Plant for the new sources of water including, the Flint River and the still under construction KWA.

127.   Flint's water treatment plant had not been adequately upgraded to treat water from the Flint River, for the water that they had received for over 50 years from the DWSD was already in a treated state.

128.   LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents. LAN also did not require or implement corrosion control to ensure there was no corrosive water distributed throughout Flint's aging water system.

129.   During this entire time Rowe was serving as the city of Flint's Acting City Engineer.

130.   The MDEQ, and the individual defendants at the agency and LAN and Rowe were responsible for ensuring Flint's water quality standards and that the water was being properly treated.

131.   The Flint River water was known to Defendants to contain up to 8 times more Chloride than the DWSD water they had been receiving for over 50 years. This would make the water from the Flint River substantially more corrosive than the water from DWSD. Trained professionals should have reason to know that corrosive water not properly

treated will corrode pipes infrastructure and service lines of the water system and cause lead and other metals to leach into the drinking water of the residents of the City of Flint's homes and businesses.

132. An estimated 15,000 of Flint's 30,000 residential service lines are composed of lead.

133. Lead is a potent neurotoxin which can have devastating impacts on the development of children along with other major health related issues. There is no safe level of lead. Its harmful effects can start even at low exposure levels.

134. Lead contamination is not the only danger caused when corrosive water is distributed into a public water system. When water corrodes iron pipes, the iron leaching into the water system can consume the chlorine therein, which is necessary to prevent the growth of microorganisms that can cause disease.

135. Soon after the switch, many resident of Flint began complaining that their water coming out of their taps was discolored and odorous.

136. On October 13, 2014, General Motors stopped using the Flint River water at its engine plant because of fears it would cause corrosion due to high levels of chloride, and was rusting engine parts, and notified the City of Flint.

137. Discussing General Motors' decision and the mounting complaints that were being made by the residents of Flint regarding discolored water, MDEQ's Prysby wrote to Busch and Shekter-Smith and others that the Flint River water had elevated chloride levels. He stated that "although not optimal" the water was "satisfactory."

138. Prysby noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

23

139.   On February 27, 2015, Stephen Busch advised EPA Employee Miguel Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.

140.   As LAN and Rowe warned, the untreated, corrosive Flint River water predictably corroding the previously antiquated but intact and metallurgically stable infrastructure, and destabilized the heretofore stable metal pipes of the Flint water delivery infrastructure, causing the elements of lead and iron to be leached from and released into the entire system, and into the taps of the residents of the City of Flint.

141.   As early as August and September of 2014, the City of Flint had issued two boil water advisories after fecal coliform bacteria were found in the Flint River water being supplied to the City of the Flint residents.

142.   Heating or boiling water will not in fact remove lead but may cause it to become more concentrated.

143.   LAN Defendants in an effort to address compliance with the EPA and MDEQ operations and regulations issued a 20-page Operation Evaluation Report on November 26, 2014. They failed to address the hazard of lead associated with the corrosiveness of the water.

144.   On January 9, 2015 the University of Michigan – Flint discovered lead in campus drinking fountains.

145.   On January 12, 2015 DWSD offered to waive a four-million-dollar reconnection fee to transition back to DWSD.

146.   Defendant Emergency Manager Gerald Ambrose declined that offer.

147.   On January 21, 2015, enraged Flint residents attended a meeting at Flint City Hall, bringing jugs of discolored water and complaining about the water's smell and taste.

148. As early as January of 2015, the State of Michigan secretly provided purified water coolers to the Flint State offices, in response to concerns about the Flint River drinking water by the state employees working therein, while the state employees continued to fraudulently tell the public that the Flint River water was safe to drink.

149. On February 27, 2015, Miguel Del Toral of the EPA began to voice his concerns about the likely cause of the high lead levels in Flint. He attributed these high lead levels to the corrosiveness of the water and the lack of adequate testing being used to screen for lead.

150. On March 3, 2015, Emergency Manager Ambrose, sent a memorandum to the Michigan Department of Treasury claiming that reconnecting to DWSD would cost at least ten (10) million dollars per year, with bills as high as one (1) million dollars per month.

151. Ambrose stated, "[I]f $12 million annually were available for discretionary use, it would be far better spent reducing rates (which were the highest in the nation) paid by Flint customers and/or modernizing the City's system."

152. According to Ambrose, "[t]he oft-repeated suggestion that the City should return to DWSD, even for a short period of time, would, in my judgment, have extremely negative financial consequences to the water system."

153. Instead of returning to the more expensive, but safe DWSD, another expert was retained by the State of Michigan in a further attempt to justify the continued connection to the Flint River.

154. In early 2015, Veolia entities were hired by Defendant Emergency Manager Gerald Ambrose, to conduct a second investigation that evaluated Flint's water quality, largely in response to citizen complaints.

155.   Veolia declared the water safe which perpetuated the water crisis and exposure and re exposure to the toxic water and poisoned tens of thousands of Flint residents and continuously damaged and weakened the structural integrity of the Flint water delivery infrastructure.

156.   Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. On January 29, 2015 Veolia, acting as Veolia Water North America Operating Services, LLC, through Mr. David Gadis, its Senior Vice President, Sales, Municipal and Commercial Development, submitted to the City of Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No.: 15-573 (Veolia's 2015 Bid4). Veolia proposes, "to address the immediate reliability and operational needs" of the City's water system.

157.   On February 12, 2015 Veolia's Vice President Rob Nicholas stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

158.   Veolia issued an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. ·

159.   In its interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing."

160.   Veolia publicly misrepresented that Flint's unsafe water was safe which was justifiably relied on by citizens of Flint to their detriment

161. Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe."

162. The interim report noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

163. In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water. "

164. Veolia issued its final "Water Quality Report" dated March 12, 2015.

165. In the final report, Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget."

166. The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

167. The final report stated, "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

168. Specifically addressing the lack of corrosion control, the final report noted, "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water.

Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

169. On March 23, 2015, Flint's powerless City Council voted 7-1 to terminate the connection to Flint River and return to DWSD.

170. Emergency Manager Ambrose declared, "It is incomprehensible to me that (seven) members of the Flint City Council would want to send more than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint," and affirmatively vetoed the City Council proposal to end the sale and use of the Flint River through the powers vested in him under the State's Emergency Manager statute.

171. Emergency Manager Ambrose further publicly misrepresented, "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality... water from Detroit is no safer than water from Flint."

172. On April 24, 2015, the EPA was finally informed by Defendant Michael Prysby, that Flint did not have optimized corrosion control in place.

173. While the individually named MDEQ defendants and the State's Emergency Managers defendants Earley and Ambrose caused, obscured, and misrepresented the safety, exposure and re exposure to the free, toxic Flint River water to the residents of the City of Flint, the individually named MDHHS defendants manipulated data and perpetuated

28

the crisis and exposure and re exposures by failing to disclose the known increases in the uptick of lead poisoning cases in Flint, yet withheld and manipulated this data, perpetuated the known water crisis, and continued exposure and re-exposure to toxic water to the residents of the City of Flint.

174. Instead, the individually named MDHHS defendants misrepresented, obfuscated, and intentionally withheld information and data which conclusively showed an uptick in the number of children in Flint who were being exposed and re-exposed to lead.

175. The Defendants discredited reports from the EPA and various other independent experts and Marc Edwards, confirming serious lead contamination in the Flint water system.

176. It took the work of outside expert, Dr. Mona Hanna-Attisha, pediatrician at Hurley Hospital in Flint to force MDHHS to acknowledge its failures.

177. In a July 28, 2015, email from MDHHS epidemiologist Cristin Larder to MDHHS employees Nancy Peeler and Patricia McKane, Larder identified an increase in blood lead levels in Flint just after the switch to river water, and concluded only that the issue "warrant[s] further investigation."

178. On the same day, Nancy Peeler sent an e-mail admitting an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014, but, without a factual basis, misrepresented and attributed it to "seasonal variation". In a September 10, 2015, e-mail from MDHHS health educator Michelle Bruneau to colleague Kory Groestch, regarding a talking points memorandum, she states: "[M]ay be a good time to float the draft out to the others because if we're going to take action it needs to be soon before the Virginia Tech University folks scandalize us all."

29

179. In a September 11, 2015, e-mail to defendant Linda Dykema and Kory Groestch of the MDHHS, Shekter-Smith wrote: "Since we last spoke, there's been an increase in the media regarding lead exposure. Any progress developing a proposal for a lead education campaign? We got a number of legislative inquiries that we are responding to. It would be helpful to have something more to say." Defendants and employees of MDHHS were uniformly dismissive of Dr. Hanna-Attisha's results.

180. Defendant Wurfel also made many discrediting statements as to Del Toral's studies and anyone trying to aid in the situation that had been developing in the City of Flint.

181. Defendant Wurfel also, made discrediting statement regarding Marc Edwards who exposed the lead levels in the Flint Drinking water. Wurfel stated, "[W]e want to be very clear that the lead levels being detected in the Flint Drinking water are not coming from the treatment plant or the City's transmission lines...The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes...the results reported so far fail to track with any of the lead sampling conducted by the City. In addition, Virginia Tech results are not reflected by the blood lead level testing regularly conducted by the state department of community health that have not shown any change since Flint switched sources."

182. Defendant Wurfel knew this statement to be false and misleading.

183. Marc Edwards from Virginia Tech, published a report in early September, 2015. His findings were: "Flint has a very serious lead in water problem;" "101 out 252 samples from flint homes had first draw lead more than 5 ppb;" "Flint's 90th percentile lead value is 25 ppb...over the EPA allowed level of 15 ppb that is applied to high risk homes. How is it possible that Flint 'passed' the official EPA Lead and Copper Rule sampling

overseen by MDEQ?" "Several Samples exceeded 10 ppb and one sample collected after 45 seconds of flushing exceeded 1000 ppb[.]"

184.   Additionally, Edwards found that "[o]n average Detroit water is 19 times less corrosive the Flint River water currently in use;" "even with phosphate, Flint River Water has 16 times more lead compared to the same condition using Detroit water."

185.   This would have become readily apparent had the water been adequately studied before the switch to the Flint River as a primary source of water.

186.   On October 16, 2015, Flint reconnected to DWSD.

187.   The City of Flint is currently in a State of Emergency: Mayor Karen Weaver declared a State of Emergency on December 14, 2015. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. On January 5, 2016, Governor Snyder declared a State of Emergency. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint. On January 14, 2016, the Governor asked President Barak Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

188.   The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

189.  In the spring and summer of 2015, the individually named defendants at MDEQ and MDHHS attempted to discredit accurate information on lead in drinking water and elevated blood levels and exposure to leaded water provided by outside experts, such as Marc Edwards.

190.  Various members of the Governor's staff expressed concerns about the water and at the same time Flint Citizens were ridiculed and ignored.  See, Flint Water Advisory Task Force Final Report ("FWATF") dated March 21, 2016, pgs. 37-38. The Flint Task Force concluded, "These failures reflect the discounting of profound public health concerns and indifference to Flint Residents' plight" (FWATF, p. 62).

191.  On December 5, 2015, the City of Flint Declared a state of emergency.

192.  On December 30, 2015, Defendant Wurfel resigned.

193.  On January 4, 2016, Genesee County declared a State of Emergency.

194.  On January 12, 2016, the Governor called the National guard into Flint and requested assistance from FEMA.

195.  On January 16, 2016, President Barack Obama Declared a federal state of emergency in Flint.

196.  On January 21, 2016 the EPA issued an Emergency Order based on its finding that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue."

197.  The Emergency Order notes that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river water was corrosive and removed

protective coatings in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

198. On February 16 2016, the state hired Defendant Rowe, to begin the process of locating, removing and eventually replacing lead pipes in the high risk areas of Flint.

199. The public health crisis spawned by the State of Emergency Declared in Flint on December 5, 2015 by Flint Mayor Karen Weaver, and later President Obama's Federal State of Emergency declared on January 16, 2016, had an immediate and substantial impairment on property values. Once the crisis became public, the value and marketability of property within the City of Flint was immediately and significantly impaired. Lenders became hesitant to authorize loans for purchase of realty within the City and property values plummeted.

200. In subsequent testimony before the United States House Oversight Committee in March of 2016, Governor Snyder testified: "From the day the City of Flint began using the Flint River as an interim water supply on April 25, 2014 and repeatedly after that MDEQ assured us that Flint's water was safe." It wasn't. A water expert at the federal EPA, tried to raise an alarm in February 2015, and he was silenced.

201. Plaintiffs justifiably relied upon the false representations from Defendants that the water was safe and appropriate for use, to their detriment. In relying on the misrepresentations by the defendants (found at **EXHIBIT B**), plaintiffs paid some of the highest water rates in the nation for water that was contaminated with various toxins disease and which posed significant risks, and which did result in harm to plaintiffs' health, property and businesses.

**Class Allegations**

33

202. This action is brought by named Plaintiffs on behalf of individuals who from April 25, 2014 to present were exposed to toxic Flint River water and experience an injury to their person, property or business or who in the future will be so injured.

203. The number of injured individual's numbers in the tens of thousands. The number of class members is therefore sufficiently numerous to have a class action status, which would be the most practical way for the plaintiffs to obtain redress for their injuries and receive equitable relief.

204. The questions of law and fact raised by the named plaintiffs are common to, and typical of, those raised by all class members.

205. The harms the named plaintiffs have alleged are typical of legal violations and harms suffered by all class members.

206. Plaintiff class representatives will fairly and adequately protect the interests of the Plaintiff class members. Plaintiffs' counsel is unaware of any conflicts of interest between the class representatives and the absent class members with respect to the matters at issue in this litigation; the class representatives will vigorously prosecute the suit on behalf of the class; and the class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal, business, and property damage.

207. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent this class.

208. Maintenance of this class action will be the superior method of adjudication and will promote the convenient administration of justice and judicial economy. Moreover, the

prosecution of separate actions by individual members of the class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

209. Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

<u>**Count I**</u>

*Gross Negligence*

210. Plaintiffs incorporate and reference all proceeding allegations set forth above as though fully stated herein.

211. The individual Flint and MDEQ, MDHHS employees (Collectively "Government Employee Defendants") and other listed defendants engaged in grossly negligent conduct defined as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

212. The named Defendants independently owed Plaintiffs a duty to exercise reasonable care.

213. The named Defendants undertook, in exchange for consideration, a duty owed to the Plaintiffs by the named Defendants.

214. Based on the named Defendants undertaking said duty, these defendants had a duty exercise reasonable care.

215. The named Defendants were grossly negligent in making or approving the decision to switch from the DWSD safe water supply to the highly corrosive, dangerous, and unpotable water from the Flint River.

216. The named Defendants through their experience, training and other reliable sources knew that the Flint River was highly corrosive and required corrosion control to be

implemented to avoid lead poisoning and other health issues of the Flint Water users, which makes their conduct so reckless that it demonstrates a substantial lack of concern for whether and injury occurred.

217.   Plaintiffs relied on the named Defendants to perform their duty to disclose any known hazards in their drinking water.

218.   Despite the named Defendants knowledge as to the dangers of the Flint River water, the government defendants deliberately and willfully failed to prevent, ameliorate, warn or even acknowledge the harm.

219.   The named Defendants were grossly negligent and breached their duties to Plaintiffs in one or more of the following ways, including but not limited to:

   a.   Failing to require corrosion control treatment of the Flint River water;

   b.   Failing to implement corrosion control treatments for the Flint River water;

   c.   Failing to conduct proper testing of the Flint River water;

   d.   Failing to response to evidence pointing to the fact that the Flint River water was improperly treated;

   e.   Misrepresenting that corrosion control treatments had been implemented;(See **EXHIBIT B**)

   f.   Publically and falsely declaring the unsafe toxic water to be safe to drink;

   g.   Ignoring and discrediting evidence that Flint's water was toxic and unsafe to drink;

   h.   Withholding and misrepresenting information to the Flint residents regarding the Flint River water's toxicity; (See **EXHIBIT B**)

   i.   Publically and falsely discrediting those who claimed that Flint's water may not be safe to drink; (See **EXHIBIT B**)

j. Failing to warn plaintiffs or the public that Flint' water was unsafe and toxic to drink. (See **EXHIBIT B**)

220. The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the gross negligence of the named Defendants as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

221. The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from the named Defendants gross negligence, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

222. Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

223. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

224. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

### Count II

*Professional Negligence*

*Lockwood, Andrews and Newnam, INC., Lockwood, Andrews and Newnam, P.C. and LEO A. DALY, CORP. Defendants*

225. Plaintiffs incorporate by reference all preceding allegations set forth above as fully stated herein.

226. The LAN and LEO A. Daly Defendants, in exchange for consideration, rendered services to the City of Flint, which they should have recognized as necessary for the protection of plaintiffs and Plaintiff Class.

227. The LAN and LEO defendants undertook a duty owed to Plaintiffs by the City of Flint and/or State of Michigan.

228. The Lan and LEO defendants had a duty to Plaintiffs to exercise reasonable care.

229. Plaintiffs and Plaintiff Class relied on the City, State, and/or LAN Defendants to perform the duty to ensure the proper treatment of the new water source.

230. The LAN and LEO defendants did not exercise reasonable care in preparing for the execution of the transition from the DWSD to the highly corrosive and dangerous Flint River water.

231. LAN and LEO failed to use reasonable care and conduct as a professional engineering firm.

232. LAN and LEO did not implement corrosion control for the Flint River water, which was extremely corrosive, and therefore failed to exercise reasonable care.

233. LAN and LEO continued to perform professional engineering services for the City of Flint water system and did not recognize the need to implement such corrosion control treatments.

234. LAN and LEO have breached their duty to ensure that they were using reasonable care and conduct as a professional engineering firm.

235. Plaintiffs and Plaintiff class we harmed by LAN and LEO not exercising reasonable care.

236. Plaintiffs' and Plaintiff Class' injuries were entirely foreseeable due to LAN and LEO not exercising reasonable care.

237. The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the negligence of the LAN and LEO defendants as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

238. The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from the LAN and LEO defendants' negligence, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and

enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

239. Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

240. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

241. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT III

*Professional Négligence*

*Rowe Professional Services*

242. Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

243. The Rowe Professional Services Defendant, in exchange for consideration, rendered services to the City of Flint, which they should have recognized as necessary for the protection of plaintiffs and Plaintiff Class.

244. The Rowe Professional Services Defendant undertook a duty owed to Plaintiffs by the City of Flint and/or State of Michigan.

245. The Rowe Professional Services Defendant had a duty to Plaintiffs to exercise reasonable care.

246. Plaintiffs and Plaintiff Class relied on the City, State, and/or Rowe Professional Services Defendant to perform the duty to ensure the proper treatment of the new water source.

247. The Rowe Professional Services Defendant did not exercise reasonable care in preparing for the execution of the transition from the DWSD to the highly corrosive and dangerous Flint River water.

248. Rowe Professional Services Defendant failed to use reasonable care and conduct as a professional engineering firm.

249. Rowe Professional Services Defendant did not implement corrosion control for the Flint River water, which was extremely corrosive, and therefore failed to exercise reasonable care.

250. Rowe Professional Services Defendant continued to perform professional engineering services for the City of Flint water system and did not recognize the need to implement such corrosion control treatments.

251. Rowe Professional Services Defendant have breached their duty to ensure that they were using reasonable care and conduct as a professional engineering firm.

252. Plaintiffs and Plaintiff class we harmed by Rowe Professional Services Defendant not exercising reasonable care.

253. Plaintiffs' and Plaintiff Class' injuries were entirely foreseeable due to Rowe Professional Services Defendant not exercising reasonable care.

254.  The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the negligence of the Rowe Professional Services Defendant as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

255.  The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from the Rowe Professional Services Defendant's negligence, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

256.  Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

257.  Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

42

258.   Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT IV

*Professional Negligence*

*Veolia North America, Inc., Veolia North America, LLC., Veolia North America Operating Services, LLC, Veolia Environement S.A.,*

259.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

260.   Defendant Veolia, in exchange for consideration, rendered services to the City of Flint, which they should have recognized as necessary for the protection of plaintiffs and Plaintiff Class.

261.   The Defendant Veolia undertook a duty owed to Plaintiffs by the City of Flint and/or State of Michigan.

262.   Plaintiffs and Plaintiff class relied on the City, State and/or defendant Veolia to perform the duty of inspecting the City's water supply to ensure that it was safe for consumption and use.

263.   Defendant Veolia failed to take reasonable care and conduct as professional engineering firm.

264.   Defendant Veolia did not take reasonable care in inspecting the City's water supply and in issuing its interim and final reports.

265. Defendant Veolia did not exercise reasonable care when it falsely declared Flint's drinking was safe as to all Federal and/or State and/or all applicable requirement, laws and regulations.

266. Defendant Veolia did not exercise reasonable care when it did not consider the problems unique to the Flint's water supply were causing medical and mental harms.

267. Defendant Veolia did not exercise reasonable care when it did not warn the residents of Flint as to the dangers of lead leaching into the Flint Water System.

268. Defendant Veolia failed to disclose the inherent risk of lead poisoning that would occur from the corrosion of the pipes.

269. In fact, Veolia's report only disclosed a harmless, aesthetic risk Specifically that the iron corrosion would lead to yellowish in coloration, pungent smelling water which was non-toxic.

270. If Veolia's report had disclosed the risk of releasing a neurotoxin which would cause irreparable brain damage to the entire Flint population, the State Defendants may have been less likely to use the Flint River.

271. The failure to disclose was relied upon by the State Defendants, who thought that after two years, once the inevitable connection to the KWA was finished, the outrage over the foul smelling yellowish water would come to an end.

272. Once the two-year gap period, in which the City of Flint would be connected to the Flint River, was over and Flint started to receive Lake Huron water through the KWA, then the foul drinking water outrage would be seen through the" rear view mirror."

273. Defendant Veolia have breached their duty to ensure that they were using reasonable care and conduct as a professional engineering firm.

44

274. Plaintiffs and Plaintiff class were harmed by Defendant Veolia not exercising reasonable care.

275. Plaintiffs' and Plaintiff Class' injuries were entirely foreseeable due to Defendant Veolia not exercising reasonable care.

276. The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the negligence of the Defendant Veolia as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

277. The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendant Veolia's negligence, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

278. Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

279. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

280. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT V

*Intentional Infliction of Emotional Distress*

281. Plaintiffs incorporate by reference all the preceding allegations set forth above as though state in full herein.

282. Defendants in providing inaccurate assurances to the Plaintiffs was not a discretionary governmental function but rather a ministerial one.

283. Defendants acted in bad faith in falsely assuring Flint water users for months that the Flint River Water was safe to consume and use. Defendants were on notice and knew that these assurances were false.

284. The conduct of Defendants was in fact intentional, because the defendants were substantially certain that if the Plaintiffs relied on their assurances they would in fact suffer a harm.

285. The defendants acted intentionally and/or recklessly, outrageously with a conscious disregard for the rights and safety of the Plaintiffs and Plaintiff Class.

286. The defendant's acts that were so outrageous, intentional, and shocking behavior were as follows but not limited to:

   a. Inflicting physical danger, assault, battery, disease and illness for no acceptable purpose;

46

b. Disseminating lies and falsehoods as set forth, in detail above;

c. Concealing and covering up, as set for in detail above.

287. The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the Defendants intentional, extreme, outrageous and/or reckless conduct as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

288. The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendants intentional, extreme, outrageous and/or reckless conduct, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

289. Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

47

290. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

291. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT VI

*Battery*

292. Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

293. The conduct of the defendants amounts to a battery because each defendant without the consent of the plaintiffs or plaintiffs class, put into motion a known harmful toxic substance (untreated Flint River Water) and it was substantially certain that Plaintiffs would be harmed in their person by exposure to said toxic and harmful substance.

294. The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the Defendants conduct as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

295. The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendants conduct, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain

and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

296. Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

297. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

298. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT VII

*Breach of Contract:*

*The City of Flint, Emergency Manager Gerald Ambrose*

299. By way of the Emergency Manager Statute, The City of Flint, its financial affairs, operations, and decision making became controlled by the State of Michigan through various Emergency Managers named as defendants herein.

300. In assuming control of the City of Flint, the State of Michigan stood in the shoes of the City of Flint for purposes of financial matters, which included the sale of drinking water to the City of Flint.

301. That in standing in the shoes of the City of Flint, the State of Michigan entered into a contract with the residents of Flint, including the plaintiffs herein, who in exchange for not only adequate consideration, but the highest water rates in the nation, received water marketed and intended for use and consumption.

302. In distributing water to the residents of flint for the particular purpose of use and consumption, in exchange for adequate consideration, an implied warranty of fitness existed requiring the water distributed by the State, its agents, servants and employee was in fact suitable for use and consumption.

303. As set forth in plaintiffs' detailed statement of facts, Emergency Manger Defendant Ambrose affirmatively stated that the water being sold to the City of Flint and its residents was suitable for use and consumption thereby giving rise to an express warranty of fitness.

304. The defendants breached their contract with the residents of Flint, including the plaintiffs herein, by failing to perform and fulfill their obligations under the contract as well as failing to distribute water that complied with the implied and express warranties referenced herein. As a direct and proximate consequence of the breach of the contract and all warranties arising therefrom, plaintiffs suffered economic losses in the form of damage to property loss of business, and lost consideration in the form of payment, which was rendered for water that was unsuitable for use or consumption in violation of the warranties and affirmative misrepresentations made by the State (*see* **EXHIBIT**

**B**), its agents, servants, and employees. What is more, is the plaintiffs suffered bodily harm and personal injury as a result of the breach of contract described herein.

305.   The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendants breach of contract, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by defendants' breach of contract.

306.   Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for said breach of contract.

307.   Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for said breach of contract.

308.   Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

**Count VIII**

*Unjust Enrichment*

309.   All Plaintiffs Against Defendants State of Michigan and City of Flint

310.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

311.   Defendants have received the benefits of the funds paid by Plaintiffs for contaminated
       water that was and is unfit for human consumption.

312.   Defendants have utilized these funds for the operation of the government(s) of Flint
       and/or Michigan.

313.   The retention of the benefit of the funds paid by Plaintiffs constitutes unjust enrichment
       in the amount of all funds paid for water that was unfit for human consumption.

314.   It would be unjust to allow Defendants to retain the benefit they obtained from
       Plaintiffs.

315.   Plaintiffs are entitled to exemplary damages.

## COUNT IX

*Common Law Fraud*

316.   Defendants made material representations regarding the Flint River water and whether
       it was safe to use and/or consume. (See List containing all presently known affirmative
       misrepresentations, omissions, and the declarant thereof attached herein as **Exhibit B**)

317.   The representations were false. (See also **Exhibit B**)

318.   Defendants when making these representations, had knowledge that they were false or
       they made the representations recklessly, without any knowledge of their truth as a
       positive assertion. Specifically, the various defendants cited in exhibit A had data
       research and personal knowledge that the water being distributed to the city of flint and
       its residents was not being properly treated with anti-corrosive measures that had been
       specifically stated as necessary by numerous engineering firms including Defendant's

LAN, Rowe and Veolia. despite said knowledge the defendants continued to misrepresent (*see* **EXHIBIT B**) through the various statements confirmed to be transmitted to the City of flint and its resident as set forth in exhibit A, that the water was safe for consumption and use. What is worse is that the defendants were aware that several data samples collected by the defendants themselves including MDEQ, MDHHS, and others indicated the water being distributed to the city of flint and its resident contained unsafe levels of lead. These unsafe levels of lead and the inherent risks of the conditions that existed in Flint were reaffirmed by various and numerous world renowned experts including but not limited to Miguel Del Toral, Dr. Marc Edwards and others in the field of lead and toxicology throughout the year of 2015 (See exhibit A containing said statements). Perhaps nothing more highlights the intent of the defendant's to misrepresent the known unsafe and toxic conditions in Flint than the affirmative efforts of the defendants to publically discredit, suppress, and prevent the aforesaid experts from disseminating their data and findings to the public so as to finally, after a two year period, alert the city of Flint and its residents to the inherent danger the water posed and the conditions that existed within their homes, schools, and public spaces.

319.  Defendants made these representations with the intention that they should be acted upon by the plaintiffs.

320.  The plaintiffs acted in reliance upon these misrepresentations. Specifically, the plaintiffs were told by engineering firm Veolia in March of 2015 (an engineering firm hired by the City of Flint and Emergency Manager Gerald Ambrose to manufacture false data to support the contention that the Flint water was safe for use and

consumption), that Flint's water was safe for consumption and was merely "unaesthetically pleasing". Furthermore, defendants required the City of Flint to continue using water from the Flint River as a primary water source even after the Flint City Council had issued a 7-1 vote to disconnect from the Flint River and reconnect to the DWSD water system. Emergency Manager, using his veto power, overturned that decision and stated the decision was "incomprehensible" and again stated that Flint's water was as safe as any water in the country, including that of Detroit.

321.  The direct and proximate cause of the plaintiffs' reliance on the defendants knowingly untrue misrepresentations as well as omissions caused severe personal injuries, loss business, and property damage, as set forth in more detail in the paragraphs above

322.  The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendants intentional, extreme, outrageous and/or reckless conduct, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

323.  Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the

loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

324. Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

325. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

## COUNT X

### *Silent Fraud*

326. Plaintiff incorporates all of the allegations contained in plaintiff's common law fraud section above with the same force and effect as if asserted herein.

327. Defendants perpetuated a fraud which arose from their suppression of the truth regarding the lead in the water and the corrosivity of said water. (See List containing all presently known affirmative misrepresentations, omissions, and the declarant thereof attached herein as **Exhibit B**)

328. Their intent was to suppress these truths regarding the corrosivity of the water to defraud the residents the City of Flint

329. Defendants were duty bound to disclose the material facts about the corrosivity and toxic conditions of the water.

330. By not disclosing such material facts, defendants have engaged in false misrepresentations which amount to fraud.

331.   The direct and proximate cause of the plaintiffs' injuries to person, business, and property, as set forth in more detail in the paragraphs above, was exposure to the toxic, corrosive, lead contaminated water and but for the Defendants intentional suppression of the truth and, their extreme, outrageous and/or reckless conduct as alleged in this Complaint, Plaintiffs would have never sustained such injuries or harm.

332.   The injuries proximately and directly caused to the Plaintiffs, and the Plaintiff Class, which arose from Defendants intentional, extreme, outrageous and/or reckless conduct, are severe and in some instances permanent. Plaintiffs have been lead poisoned and have suffered past, present, and future injuries, including but not limited to: various health problems, physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries, including but not limited to, cognitive deficits and lost earning capacity. This entitles Plaintiffs and Plaintiff class to an award for damages for both the economic harm caused by exposure and physical and mental harm caused by exposure, as well as punitive and/or exemplary damages.

333.   Each Plaintiff and Plaintiff class member who owned or had a property interest in Flint real estate has had their property damaged and should be properly compensated for the loss of use and value including but not limited to replacement of plumbing or service lines as necessary.

334.   Each Plaintiff and Plaintiff class member who owned or had a business interest in Flint has had their business damaged and should be properly compensated for the loss of use and business earnings as necessary.

335. Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled to.

WHEREFORE, Plaintiffs respectfully request that the court issue injunctive relief and judgement against defendants, for:

a.  Compensatory damages;

b.  Punitive Damages;

c.  Pre-judgment and post judgment interest;

d.  Attorney's fees and litigation expenses; and

e.  Any such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs herby demand a trial by jury for all claims so triable.

Respectfully Submitted,

**Excolo Law, PLLC**

*/S/ Solomon M. Radner*
Solomon M. Radner (P73653)
*Attorney for Plaintiffs*
26700 Lahser Road, Suite 401
Southfield, MI 48033
T: 866.939.2656
F: 248.436.6858
sradner@excololaw.com

Dated: January 26, 2017

# <u>EXHIBIT A</u>

| First Name | Last Name | Address | City | State | Zip |
|---|---|---|---|---|---|
| Aby | Ndoye | 5440 Woodland Ride Drive | Flint | MI | 48532 |
| Robbin | Davis | 4517 North Street | Flint | MI | 48505 |
| Vincent | Stallings | 1708 N Ballenger Hwy | Flint | MI | 48504 |
| Kenyatta | Walters | 3108 Flushing | Flint | MI | 48504 |
| Bobby | Howell Jr. | 3701 Gratiot | Flint | MI | 48503 |
| Mahmoud Ahmed | Zaki | 422 S Dort Hwy | Flint | MI | 48503 |
| Gerald | Battle | 4405 Cloverlawn Dr. | Flint | MI | 48504 |
| Neil | Helmkay | 1807 N Franklin Ave | Flint | MI | 48506 |
| Carlyle | Dennie | 1806 Ridge Cliff Drive | Flint | MI | 48532 |
| Houssein | Hachem | 4018 Corunna St | Flint | MI | 48532 |
| Mary | Alexander | 826 E 7th St | Flint | MI | 48503 |
| Kenneth | McNley | 1050 W- Mandeville St- | Flint | MI | 48507 |
| Jo'ann | Marshall | 1052 W.Vernon Dr | Flint | MI | 48503 |
| Lonnieshia | Crawford | 5343 Ridgebend Dr | Flint | MI | 48507 |
| Nena | McAfee | 1405 Raspberry Ln | Flint | MI | 48507 |
| Janice | Cooper | 6902 Parkbelt Dr. | Flint | MI | 48505 |
| Reginald | Williams | 5607 Fleming Rd | Flint | MI | 48505 |
| Charles | Tyler | 712 N Grand Travese St | Flint | MI | 48503 |
| Eric | Morris-Lester | 140 E. Holbrook Ave. | Flint | MI | 48505 |
| Richard | Smith | 6901 Colonial Dr | Flint | MI | 48505 |
| Orlond | McAfee | 1633 N. Saginaw St. | Flint | MI | 48503 |
| Gzil | Sewell | 414 Damon | Flint | Mi | 48505 |
| Ruby | Upchurch | 9180 Chatwell Club Apt 14 | Davison | Mi | 48423 |
| Evan | Saturnino | 601 Layfette St | Flint | Mi | 48505 |
| Carinthians | Carouthers | 3221 Irroquois Av | Flint | Mi | 48505 |
| Shirlet | Earnest | 2248 Maiden Lane | Grand Blanc | Mi | 48439 |
| Taneisha | Taylor | 3510 Proctor Av | Flint | Mi | 48504 |
| RALPH | WELCH | 3315 HELBER | FLINT | MI | 48505 |
| MELODY | SMITH | 7001 DARRYLL DR | FLINT | MI | 48505 |
| Connie | McNeal | 1602 Waldman Ave | Flint | MI | 48507 |
| CHARLOTTE | McCANN | 2524 CLIO RD | FLINT | MI | 48505 |

| | | | | | |
|---|---|---|---|---|---|
| DEPRETHA | GILL | 357 E HOME AVE | FLINT | MI | 48505 |
| NATHANIEL | GIBSON | 7014 CLIO RD | FLINT | MI | 48504 |
| DENNIS | HOWARD | 3743 LYNN ST | FLINT | MI | 48503 |
| JOYCE | ALSTON | 1190 MARIE CT | FLINT | MI | 48532 |
| THEDORE Z | BOTOS | 910 VICTORIA AVE | FLINT | MI | 48504 |
| HERCY J | WILLIAMS | 3900 HAMMERBERG RD | FLINT | MI | 48507 |
| MAURICE | DUNN | 605 N SAGINAW ST | FLINT | MI | 48502 |
| TANISHA | SUMMERS | 2302 FLUSHING RD | FLINT | MI | 48504 |
| RANDALL | ALLAN | 5018 GREEN RD | FLINT | MI | 48430 |
| SANDRA | WILLIAMS | 1260 SPRINGBORROW DR | FLINT | MI | 48532 |
| DAVONTA' | SEAREY | 2734 MILLIKEN CT | FLINT | MI | 48505 |
| ARLEE | WEDLOW | 119 W RANKIN ST | FLINT | MI | 48505 |
| DWIGHT | RICHARDSON | 2650 TIMBERLANE DR | FLUSHING | MI | 48433 |
| KEVIN | JACKSON | 123 HILLCREST CV | MARION | AR | 72364 |

# <u>EXHIBIT B</u>

**Quotes and Misrepresentations by Named Defendants**

**Black is the Quote**

**Red is Date/where the Quote is Coming From**

**Blue is explanation of the quote**

**The emails can be found in Snyder's email release. He released 200+ pages of emails from the Michigan government officials that discuss the Flint Water Crisis. Many of the emails are detailed and explained by the Michigan truth Squad in the "Disaster Day by Day: A Detailed Flint Crisis Timeline" by the Bridge Magazine. http://bridgemi.com/2016/02/flint-water-disaster-timeline/**

**GOVERNOR RICHARD DALE SNYDER**

1) "[t]he water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets."- October 2, 2015 Gov. Snyder's Comprehensive Action Plan (this places the blame yet again on the people home pipes and not the Flint WTP and the Flint Water Transmission system)

2) "Government failed you at the Federal, State and local level."-Governor's admission

3) "Initial analysis of MDHHS data found that blood lead levels of children in Flint have followed an expected seasonal trend. While this analysis for Flint as a whole remains true, a comprehensive and detailed review breaking down data by Zip codes with the city revealed that MDHHS data is consistent with a study presented recently by Hurley Children's Hospital."-October 2, 2015 Comprehensive action plan will help flint residents address water concerns (misrepresentation here is that the blood levels followed a seasonal trend. The press release does not state that the water was the true cause of the elevated lead blood levels.)

4) Snyder requests and receives a briefing paper from MDEQ. The paper blames September 2014 boil water advisories due toecoli bacteria in Flint drinking water on a variety of factors, most notably decrepit, 75-year-old cast iron water pipes subject to corrosion and bacteria. October 2014 Briefing Paper from MDEQ. (No mention of lead issues in Flint water at this time.)

5) "This is a public relations crisis – because of a real or perceived problem is irrelevant – waiting to explode nationally. If Flint had been hit with a natural disaster that affected its water system, the state would be stepping in to provide bottled water or other assistance. What can we do given the current circumstances?"-January 23, 2015 Synder Administrator special projects manager Ari Adler (not calling the Flint crisis a true problem and only referring to it as a PR nightmare)

6) 1) Many resident complaints about color, taste and smell of tap water since the Flint River switch; 2) Congressman Dan Kildee distributing bottled water; 3) Mayor Walling seeking state and federal assistance for $20 million in debt forgiveness to upgrade water treatment

and calling for the governor to personally come to Flint (a telephone conference between the two then ensued and they pledged to work together on solutions); 4) State Rep. Sheldon Neeley (D-Flint) sending a letter to the governor stating his constituents "are on the verge of civil unrest."—February 2015 Briefing Memo to the Governor (regarding the water situation in Flint, lead is not mentioned.)

7) "Team, Here's the data that will be presented at the Hurley Hospital press conference at 3 p.m. As you'll see, they are pointing to individual children, a very emotional approach. Our challenge will be to show how our state data is different from what the hospital and the coalition members are presenting today."--- September 24, 2015: Snyder Deputy Press Secretary Dave Murray emails more than a dozen state officials, including Muchmore (then-chief of staff), Jerrod Agen (the governor's future chief of staff), Lasher, and Brad Wurfel at MDEQ. (Saying the data being used by the Hurley hospital is too emotional and not representative of what the data should be)

8) "The water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets." "State health experts said there has been an increase in elevated childhood blood lead levels in some specific communities. Initial analysis of MDHHS data found blood lead levels of children in Flint have followed an expected seasonal trend. While this analysis for Flint as a while remains true, a comprehensive and detailed review breaking down data by ZIP codes with the city revealed that MDHHS data is consistent with a study presented recently by Hurley Children's Hospital."—October 2, 2015 talking points about Snyder's Comprehensive Action Plan for the Flint Water Crisis (still places the blame for the lead on the peoples' home plumbing system and not because of any problems with the water, WTP, or Transmission lines.)

9) "The Michigan Department of Health and Human Services has been, and continues to be, committed to full disclosure of information regarding the city of Flint and blood lead levels. To suggest otherwise is not consistent with how we have responded." "It wasn't until the Hurley report came out that our epidemiologists took a more in-depth look at the data by zip code, controlling for seasonal variation, and confirmed an increase outside of normal trends. As a result of this process, we have determined that the way we analyze data collected needs to be thoroughly reviewed."—December 22, 2015 Snyder Communications director Meegan Holland (states that MDHHS has responded to the crisis appropriately and adequately, which is false. This was a huge gap in the regulatory framework to protect public health. The concerns of two established outside researchers (from EPA and Virginia Tech) weren't sufficient to prompt state agencies to reconsider their approach to lead detection. It took a local physician to open up the state's eyes to the problem they had strongly denied.)

10) "The recommendations in this letter suggest profound change at DEQ and openly criticize Director Wyant. If this is the path that the Task Force is on, it is best to make changes at DEQ sooner rather than later. That likely means accepting Dan's resignation. It also means moving up the termination of the 3 DEQ personnel previously planned for Jan 4 to tomorrow."—December 28, 2015 email from Jerrod Agen to Governor Snyder (about making changes at the DEQ before the Task Force can publish their findings)

11) "When I became aware that the city of Flint's water showed elevated lead levels and that the state's handling of the situation was being questioned, I requested funding to switch the source back to (Detroit) and appointed an independent task force to identify possible missteps and areas for improvement."—December 29, 2015 statement from Gov. Snyder in email from Communications Director Meegan Holland (He was aware almost from the start of the crisis and did not request Flint going back to the DWSD until the public became outraged over the crisis and it became a nationally televised issue)

12) "City of Flint decides to use the Flint River as a water source."-January 21, 2016 Governor Snyder's State of the State (City officials did not drive the decision to take water from the Flint River. The city council vote was just to switch to the KWA when it would be complete. Also Ed Kurtz made the decision to switch to the Flint River)

13) "That's not factual information for your readers and listeners. In fact, in the spring of 2013, the Flint City Council, and Mayor Walling, made the decision to switch to Karegnondi, and in the meantime, take some of its water from the Flint River. This was approved at the city council meeting in a 7-1 vote on Monday, March 25, 2013.  Their decision was then sent to the emergency manager to approve. In fact, at the time, Flint City Council President Scott Kincaid said "I've never been a fan of staying with Detroit." It is critical to note that Flint and Genesee Co. had been in discussions to start their own water authority for years before this decision was reached.  They had been gathering information on a switch and leaning toward that decision far before the Gov. was even in office."—email from the governor's Deputy Press Secretary Anna Heaton in reponse to Lindsey Smiths article with her version of a timeline (Nowhere in that vote or other votes did Flint City Council say, "We support getting water from the Flint River." Yes, there was one councilman who did openly support that. But as a board, that vote never happened. Flint leaders never made that call.)

## DENNIS MUCHMORE, Governor's Chief of Staff

1) "I'm frustrated by the water issue in Flint. I really don't think people are getting the benefit of the doubt. Now they are concerned and rightfully so about the lead level studies they are receiving from DEQ samples. Can you take a moment out of your impossible schedule to personally take a look at this? These folks are scared and worried about the health impacts and they are basically getting blown off by us (as a state we're just not sympathizing with their plight)."-July 22, 2015 email urging Nick Lyon (MDHSS) and Dan Wyant (MDEQ) to go deeper on Flint and remarks on the Flint Situation

2) "The DEQ and [MDHHS] feel that some in Flint are taking the very sensitive issue of children's exposure to lead and trying to turn it into a political football claiming the departments are underestimating the impacts on the populations and are particularly trying to shift responsibility to the state…I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject. The real responsibility rests with the County, city, and KWA[.]"-September 25,2015 Email from Snyder Chief of Staff Dennis Muchmore to Snyder and others in Snyder's office (speaking to the state's responsibility in the Flint Crisis, downplays the State's role in the decision to switch to KWA and use the Flint River in the interim)

3) "It seems that continuing to find funds to buy local residents home filters is really a viable option and Harvey and all are pursuing more assistance in that work. Almost all the 'experts' I've talked to are convinced the problem is in the old lines leading to homes and short of a massive replacement CSO type bond that wouldn't resolve the issue for a couple of years, nature (temp reductions), filters and a final connect seem to be the best courses of action. The residents are caught in a swirl of misinformation and long term distrust of local government unlikely to be resolved." September 26, 2015 (Considering options for the Flint residents and stating that the Filter solution was a viable cost effective option instead the stopping of utilizing corrosive Flint River water.)

4) "[Flint Congressman Dan] Kildee is engaged in his normal press hound routine, which is unfortunate because he's a really smart, talented guy who needs to roll up his sleeves while (State Senator Jim) Ananich is looking for relief but doesn't know where it would come from and is as usual a positive force. Frankly, I think both know that (Flint Mayor Dayne)Walling went out on CYA effort due to the election, but of course can't say so. Neither has any idea where his $30M figure came from, or where we would get it even if you were so inclined." "The water certainly has occasional less than savory aspects like color because of the apparently more corrosive aspects of the hard water coming from the river, but that has died down with the additional main filters. Taste and smell have been problems also and substantial money has been extended to work on those issues." "Now we have the anti-everything group turning to the lead content which is a concern for everyone, but DEQ and DHHS and EPA can't find evidence of a major change per Geralyn's memo below. Of course, some of the Flint people respond by looking for someone to blame instead of working to reduce anxiety. We can't tolerate increased lead levels in any event, but it's really the city's water system that needs to deal with it. We're throwing as much assistance as possible at the lead problem as regardless of what the levels, explanations or proposed solutions, the residents and particularly the poor need help to deal with it."-September 26, 2015 email to the governor and other staffers (asserts that a decent amount of money has already been used towards the Flint lead issue and the "less savory aspects of the water" have been solved through water filters. No admission that the water is what is causing the lead issues)

5) "Since we're in charge we can hardly ignore the people of Flint," "After all, if GM refuses to use the water in their plant and our own agencies are warning people not to drink it… we look pretty stupid hiding behind some financial statement."- February 2015 Muchmore wrote to state Treasury and public relations officials (the governor was not copied on the original email.)

6) "It's in the city's long term interest to make the KWA work and we can make the river water safe, but we need to work with the ministers this week to help them out. It's tough for everyday people to listen to financial issues and water mumbo jumbo when all they see is problems. You can't expect the ministers to hold the tide on this problem… If we procrastinate much longer in doing something direct we'll have real trouble."-March 3, 2015 Snyder Chief of staff emails numerous other Snyder aides and state Treasury officials

**Andy Dillon**

1) "After briefing, I was satisfied there was no construction risk to Flint and learned after input from (the DEQ) that KWA water would in fact be cheaper for Flint residents,

2) "Governor, based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor, and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email." "We have a briefing call tomorrow morning with Dennis and John to provide more background as to why we reached this conclusion. Flint's Emergency Manager wants to sign the resolution asap as the project is moving forward with or without them and their participation affects the design and the construction season is upon them. I assume DWSD will make a last ditch effort to save the customer but I will not advise them of my recommendation until we brief Dennis and John." -- March 28, 2013: Email from State Treasurer Andy Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and MDEQ Director Dan Wyant

3) State Treasurer Andy Dillon gives state emergency manager Ed Kurtz permission to notify the Detroit Water and Sewerage Department that it would be terminating service in the future and contracting with the KWA. (As reported in the Michigan Department of Treasury Flint Water Timeline, September 2015.) April 2013: Briefing to Ed Kurtz

4) The state of Michigan has approved Flint's plans to get its water by participating in a pipeline project that would tap Lake Huron. Approved by Andy Dillon April 2013 Andy Dillon approving plan for Flint to participate in the KWA pipeline project

5) "As such, this approval will be effective at 5 p.m. on April 16 ... after receiving written notice from the city that either no such offer was presented to the county and the city or that an offer was received and was rejected in good faith based upon specified objections."-- April 11, 2013 letter to Ed Kurtz updating him on Approval of the Flint switch to the KWA

6) "DWSD at the time was overseen by a board appointed by (U.S. District) Judge (Sean) Cox as the system was under federal oversight," Dillon said. "If Flint was unable to negotiate a fair deal, I recall their backup plan was to use the Flint River. I don't recall Treasury being involved in the negotiations with DWSD or, after negotiations broke down, in Flint's decision to switch to the Flint River." November 18, 2015 email from Andy Dillon to the Press

7) "After we signed off on Flint joining the KWA, Flint was to negotiate with the DWSD regarding using their water during the construction of the KWA," Dillon said. November 18, 2015 email from Andy Dillon to the Press (This is a misrepresentation because the City of Flint using the Flint River was packaged into the KWA agreement)

8) "provide an analysis of the water supply options to assist the treasurer in determining any potential risk and the best course going forward for supplying potable water to the City of Flint."—February 2013 to Tucker, young, Jackson, Tull Inc. (as to why Dillon commissioned Tucker, Young, and Tull; Their study found it would be less costly for Flint to stay with the Detroit Water and Sewerage Department than to cover its 30% share of the new KWA pipeline from Lake Huron.)

9) "Treasury held two and possibly three lengthy meetings to go over the Tucker Young report with the Flint leaders, KWA consultants and DEQ representatives," Dillon said. "During these meetings, we learned several assumptions made by TY were incorrect and undermined the conclusions reached in their report." November 18, 2015 email from Andy Dillon to the Press (The treasury poked holes in the TYT study because it did not support the decision that by switching to the not yet built KWA, the Flint River which was deemed to be a corrosive undesirable water source by TYT would have to serve the City of Flint's demand for water in the interim.)

10) "I never received any pressure from the governor's office to decide one way or the other on approving the KWA," "We ... made a decision based upon what we thought was in the best interests of Flint. The decision to support KWA was influenced by our conclusion that there was no financial risk to Flint for the project, and the DEQ's conclusion that it was more beneficial and economical for Flint to join KWA (again a separate and distinct decision from using the Flint River)." "this is the outcome the local officials wanted," – November 18, 2015 email from Andy Dillon to the Press ***** (Admission that Dillon was involved in the KWA decision) *****

## DANIEL WYANT, Director of MDEQ

1) "With respect to the draft memo referenced in your letter, the MDEQ does not review or receive draft memos from the USEPA, nor would we expect to while it is a draft."- September 17, 2015 email response to inquiry from Flint area legislators Jim Ananich, Sheldon Neely, and Phil Phelps (Misrepresenting the policy on EPA memos)

2) "staff made a mistake while working with the city of Flint. Simply stated, staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not." Also; "simply said, our staff believed they were constrained by two consecutive six-month tests. We followed and defended that protocol. I believe now we made a mistake. For communities with a population above 50,000, optimized corrosion control should have been required from the beginning. Because of what I have learned, I will be announcing a change in leadership in our drinking water program."-October 18, 2015 email to Governor Snyder (admitting that the MDEQ made many mistakes over the course of this whole crisis and that Miguel Del Toral was correct)

3) "actions reflected inexperience, and our public response to the criticism was the wrong tone early in this conversation."-October 18, 2015 remarking on MDEQ's response to the crisis (admitting that the MDEQ made many mistakes over the course of this whole crisis and that Miguel Del Toral was correct)

4) "There is substantial controversy over the lead and copper rule – the EPA has been working for years on ways to update it, and Michigan will be an active part of that conversation going forward. The situation in Flint is a snapshot of an issue affecting cities around the state and the nation. More than a dozen states use the same sampling protocol Michigan uses – that's not a defense of the protocol, but rather an indication that even experts on the issue disagree about the most effective testing methods. What everyone can agree on is that lead is a serious issue. And I think everyone can agree that when the state came to recognize that there could be a health threat in the city, we took appropriate action. We are now

engaged in an unprecedented effort to protect kids and families in Flint, develop more knowledge about what has happened and how people were affected, and take steps to make sure it doesn't happen again – in Michigan, or anywhere else. All the people who brought this issue forward deserve credit for bringing it to us. Our actions reflected inexperience, and our public response to the criticism was the wrong tone early in this conversation. But the best we can do with the situation going forward is represented in our present course – the Governor's plan represents all the suggestions outlined in the draft EPA memo, the Virginia Tech report, and the guidance we've gotten from EPA."—October 18, 2015 response to a Detroit News inquiry (admission that the lead issue has become a serious issue that needs to be addressed, however, states that the MDEQ did enough when addressing this problem since the beginning and that experts can disagree which does not make the MDEQ experts and their sampling methods wrong; this was proven to be wrong due to the fact that their methods were faulty for sampling the water and testing for lead and legionella)

**MDEQ**

1) Jim Sygo writes that he's never seen trihalomethane issues (one of the early water safety violations in Flint "cause such discoloration" in drinking water. January 29, 2015 email response to other state defendants about the Bridge Magazine story regarding resident complaints about Flint Water

2) "hiccups" ranging from the boil water advisories, to increased bacteria, to increased chlorine required to treat the water with the side effects of potentially higher trihalomethanes (a potential health threat)… "But it's not like an imminent threat to public health." DEQ also states, "The City of Flint has tremendous need to address its water delivery system." Regarding the trihalomethane issue, DEQ says it's a key thing "to remember that once the city connects to the new KWA system in 2016, this issue will fade into the rearview."—February 2015 MDEQ Backgrounder memo to Gov. Snyder on the Flint Water Situation

3) DEQ responded to EPA saying that the Flint Water Treatment Plant has an optimized corrosion control program. -February 27, 2015 MDEQ response to EPA about Corrosion control (this proved to be false as can be seen through Stephen Busch's email correspondence)

**KEY POINTS FROM THE MDEQ BRIEFING PAPER TO THE FLINT WATER TASK FORCE November 16, 2015**

4) "**Did the DEQ require the City to have corrosion control in place when it switched to the Flint River as its source of drinking water?** No… The DEQ requested that the City perform two 6-month rounds of monitoring to demonstrate if the City was practicing optimal corrosion control treatment…. Since the City water system had not been the supplier of water before, the DEQ did not require the City to maintain corrosion control for

which it was not responsible…. The DEQ's instructions to the City were consistent with past practices afforded to all other large water systems. At the beginning of the (Lead and Copper Rule), all large systems were initially granted the option to demonstrate optimal corrosion control treatment through full-scale monitoring under the applicable rules. For these reasons, two 6-month rounds of monitoring, as required by the LCR, were the required means to determine whether or not optimal corrosion control was being achieved."

5) "**What was the DEQ's response to the USEPA's inquiry in February 2015 regarding optimized corrosion control treatment being implemented by the City under the LCR.** The DEQ indicated that the City was complying with the LCR, the lead 90th percentile level was below the action level of 15 ppb, and the City was already conducting the second round of monitoring which would provide for a determination of whether additional treatment needed to be installed. It should be noted that once treatment is designated as optimal, there is no requirement in the LCR that lead results be lower than they were before treatment was installed. The 90th percentile only needs to be lower than the action level in the LCR."

6) "**Did the DEQ attempt to mislead the USEPA in a February 27, 2015, email responding to the USEPA's inquiry regarding Optimal Corrosion Control Treatment?** No. There was no attempt by the DEQ to mislead the USEPA. There is an email from Steve Busch, Jackson and Lansing District Supervisor, Office of Drinking Water and Municipal Assistance, indicating that the City was practicing a corrosion control program. What was meant was that the City was performing the required monitoring to determine whether or not they were practicing optimized corrosion control. The DEQ subsequently clarified its position in follow-up emails and telephone conversations with the USEPA."

7) "**When General Motors announced its intent to terminate water service from the City… should this have been a sign that there were concerns with the quality of the water after the switch to the Flint River?**.. No. General Motors made a decision regarding the quality of the water for its manufacturing processes. At the time, the company indicated that the chloride levels were above limits acceptable as part of the manufacturing facility's limit for production purposes. The level of chlorides in the water treated by the City was not a human health or aesthetic concern." (Chlorides accelerate corrosion, so much so that the Flint water was no longer suitable for GM's manufacturing processes. Corrosion also accelerates lead levels in drinking water. Outside experts like Virginia Tech's Marc Edwards and Flint Dr. Mona Hanna-Attisha clearly connected these dots. Yet MDEQ did not react to this General Motors warning sign.)

8) Additional revelations about how lead samples were collected in Flint. (An issue first raised in part by Miguel Del Toral in February 2015 and amplified in the fall by Virginia Tech's Marc Edwards) "DEQ had no reason to question the validity of the City's reports until the DEQ heard City employees revealing to the media that the City did not know for certain if its compliance monitoring was collected from homes with lead service lines… (T)he DEQ determined from information available that a significant number of these sites that had been listed as having lead service lines either did not have them or the information was unavailable. On November 9, 2015, the DEQ notified the City in writing that it would be

necessary to conduct a complete assessment of its sampling pool and report back its findings by December 30, 2015.

9) "**Do the DEQ's sampling instructions comply with the Lead and Copper Rule?** The DEQ continues to seek official clarification from the USEPA regarding the sampling protocols. [NOTE: This is NINE months after EPA's Del Toral raises serious questions about DEQ's sampling protocols. Early in the implementation of the LCR, the DEQ had encountered too many situations where compliance samples had been collected from kitchen and bathroom taps that had not been used in days and in some cases, even weeks, resulting in excessively stagnated water and correspondingly high lead levels that did not represent typical exposure expected after overnight stagnation…. In order to ensure samples were taken at customer taps representative of typical use, the DEQ devised the current recommendations for ensuring appropriate but not excessive stagnation for LCR monitoring."

## NICK LYON, Director of MDHHS

1) In an e- mail, he stated: "I need an analysis of the Virginia Tech/Hurley data and their conclusions. I would like to make a strong statement with a demonstration of proof that the lead blood levels seen are not out of the ordinary and are attributable to seasonal fluctuations. Geralyn is working on this for me but she needs someone in public health who can work directly with her on immediate concerns/questions."-September 28,2015 internal email to his department (regarding needing proof to say the lead blood levels were not out of the ordinary so he could prove the Edwards and Hurley studies were wrong and the MDHHS and other state agencies were correct the whole time even though they knew they were not.)

2) Lyon: "I'd like to express my appreciation to the Hurley doctors for bringing this issue to our attention. Is that ok?" Wells: "Yes, yes, yes, is my vote!!!!" Lyon: "Can I confidently say that we were not aware before last week?" Wells: "I was aware only of (Virginia Tech) and DEQ media; until Thursday last week."—October 1, 2015 email exchange between Lyon and Wells (Lyon didn't get the MDHHS data defense he'd requested just a few days earlier. The data showed just the opposite. The scientific proof of the true extent of the Flint disaster is completely brought to light by outside researchers (Virginia Tech and Hurley). Those outside researchers must first overcome the denials and deflections of two state departments in which dozens of state workers – from Snyder appointees and spokespeople, to medical "experts," to technical regulators and other government employees.)

3) "A recent announcement by local doctors that blood lead levels are rising in children residing in Flint's most at-risk ZIP codes added to the state's knowledge and sparked some additional precautionary measures." "The state takes lead seriously. Although continued analysis is being conducted, the MDHHS analysis is consistent with the local finding." – October 2, 2015 Email from Snyder Deputy Press Secretary Dave Murray transmits a release by MDEQ Director Dan Wyant and MDHHS Director Nick Lyon with more admissions (admissions by Lyon, but in the end still says the state was doing everything correctly)

4) "While we cannot conclusively say that the water source change is the sole cause of the increase, this analysis supports our efforts as we take active steps to reduce all potential lead exposures in Flint"—October 2, 2015 Said by Nick Lyon and quoted by Governor Snyder in his Comprehensive Action Plan to address Flint Water issues

## MDHHS

1) "Final Legionellosis outbreak report" to the Genesee County Health Department and discusses the report with the U.S. Centers for Disease Control and Prevention. The report confirms 45 cases of the disease and says more than half of the patients had a "healthcare facility exposure" shortly before developing the illness. Others were exposed to Flint water at their home – others did not. – June 4, 2015 report sent to the Genesee County Health Department

2) "The DEQ… gave a long summary about the Flint water issues…. bottom line is that the water itself is safe but they have an old water treatment plan and old cast iron pipes that haven't been upgraded in more than 40 years…. Flint is not in violation of the lead standards… DEQ briefed the mayor and some legislators on Monday on the situation… Flint's water supply is not an imminent public health problem but a public confidence problem due to the many groups getting involved and controversial reports/media coverage on it."- September 23, 2015 email from Mikelle Robinson to colleagues at MDHHS (describing briefing to the governor where the water was not blamed for the Lead and stated that there was no lead issue, both of which were false)

3) Email from Wesley Priem, manager of the MDHHS Healthy Homes Section, to colleague Kory Groetsch: "Yes, the issue is moving… at the speed of rushing water… I am trying to keep everyone updated… I am also trying at this minute to watch the teleconference on MLive… But not having much success… This is definitely being driven by a little science and a lot of politics."—September 24, 2015 email between Wesley Priem and Kory Groetsch (dismissing Dr. Hanna-Attisha results and stating that she was motivated by politics.)

4) "MDHHS epidemiologists continue to review the 'data' provided by a Hurley Hospital physician that showed an increase in lead activity following the change in water supply. While we continue to review this data, we have stated publicly that Hurley conducted their analysis in a much different way than we do at the department. Hurley used two partial years of data, MDHHS looked at five comprehensive years and saw no increase outside the normal seasonal increases. The Hurley review was also a much smaller sample than MDHHS data as ours includes all hospital systems in Flint as well as outside laboratories." "We have also provided the attached data chart that outlines if the elevated blood lead levels were being driven by change in water, we would have seen the elevated levels remain high after the change in water source." The MDHHS charts further question the assertion of elevated lead levels being due to the Flint water change. Lead paint is another cause of elevated lead levels, with data suggesting routine elevations in warmer months due to more lead paint chips/dust being in the air. The charts suggested lead levels "remained fairly steady" over the past five years, including before and after the water shift… "If elevated blood lead levels were being driven by the change in water, we would expect to see the elevated

levels remain high after the change in water source, rather than follow the seasonal pattern as they did by decreasing in the fall months." -- September 25, 2015: Email from MDHHS Deputy Director Geralyn Lasher to Snyder's chief of staff Dennis Muchmore, MDEQ Director Dan Wyant, MDEQ Director of Communications Brad Wurfel (continued agency skepticism about the methodology used in the outside reports and further efforts of trying to discredit the studies)

5)   "Initial analysis of MDHHS data found that blood lead levels of children in Flint have followed an expected seasonal trend; due to small numbers further analysis was initiated." "After a comprehensive and detailed review down to the zip code level, we have found that the state analysis is consistent with that presented by Hurley." "There is an increased proportion of children with elevated blood lead levels in several zip codes, particularly 03 and 04. These appear to have increased over the past 1.5 years." "Lead exposure can occur from a number of different sources (such as paint, gasoline, solder, and consumer products) and through different pathways (such as air, food, water, dust and soil.) Although there are several exposure sources, lead-based paint is still the most widespread and dangerous high-dose source of lead exposure for young children." "We reviewed MDHHS statewide data using the same methodology used by Hurley, looking at our numbers by zip code and age ranges, and filtering out non-Flint children. Routine surveillance of blood lead levels does not analyze data down to the zip code level. Detailed analysis like this occurs when there is reason to focus on precise locations or populations."- October 1, 2015 MDHHS talking points memo (The state had not previously performed this detailed analysis, despite clear reason to focus on precise locations and populations in the city of Flint for months. It took a Flint doctor to show state government experts the path to the truth. With this admission, state agencies and the Snyder Administration finally begin to shift from defense, denial, and deflection to action.)

## LIANE SHEKTER SMITH, Chief of the Office of Drinking Water and Municipal Assistance for MDEQ

1)   "I'm theorizing here, but most likely what they are seeing is a result of differing water chemistry. A change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system. This may continue for a while until things stabilize. It would be unusual for water leaving the plant to have color like people are seeing at their taps. Generally this is a distribution system problem or a premise plumbing issues. Since it appears wide-spread, it's most likely a distribution system problem." January 29, 2015 email to MDEQ Deputy Director Jim Sygo (regarding a change in water chemistry misrepresentation)

2)   "The balance here is between what is realistic and what is ideal. Of course, everyone wants 100 percent compliance. The reality, however, is that it's impossible. It's not that we 'allow' a Flint to occur; circumstances happen. Water mains break, systems lose pressure, bacteria gets into the system, regulations change and systems that were in compliance no

longer are, etc. Do we want to put a goal in black and white that cannot be met but sounds good? Or do we want to establish a goal that challenges us but can actually be accomplished? Perhaps there's a middle ground?"-May 12, 2015 response to MDEQ Water Resources Chief, William Creal, and Director of Michigan Office of the great lakes, Jon Allan (effectively making a decision to not achieve 100% of community based health standards)

3) "while we understand your concerns with the overall implementation of the lead and copper rule; we think it is appropriate for EPA to indicate in writing (an email would be sufficient) your concurrence that the city is in compliance with the lead and copper rule as implemented in Michigan… This would help distinguish between our goals to address important public health issues separately from the compliance requirements of the actual rule which we believe have been and continue to be met in the city of Flint."-July 2015 email to EPAs Tinka Hyde

4) "Since we last spoke, there's been an increase in the media regarding lead exposure. Any progress developing a proposal for a lead education campaign? We got a number of legislative inquiries that we are responding to. It would be helpful to have something more to say."-September 11, 2015 Email to Dykema and Groestch (Liane did not know how to respond to the inquiries and was looking for someone in MDHHS to direct her in what to falsely report)

5) "Staff believed that it was appropriate to monitor for two 6-month rounds of sampling to determine if additional measures were necessary. Based on the sampling performed, the city is required to install corrosion control treatment…A pilot test was not required or conducted. Staff believed that it was appropriate to monitor for two 6-month rounds to determine if additional measures would be necessary."-October 15, 2015 email to Wurfel

6) "Our position has always been that we do not dictate which acceptable option(s) a water supply may choose. Our responsibility is to see that operations are managed properly, regulations are met, and safe water is delivered. For example, when Flint decided to leave Detroit and operate using the River, our role wasn't to tell them our opinion; only what steps would be necessary to make the switch."-January 21, 2015 Email from Liane Shekter Smith to MDEQ colleagues Stephen Busch, Mike Prysby, Richard Benzie, Maggie Datema, Sara Howes, Brad Wurfel, and Jim Sygo (the agency's deputy director). (Misrepresenting what the role of MDHHS was in the Flint River switch process)

7) "As indicated during the meeting, the City's sampling for lead complies with the Action Level standard of 15 parts per billion, but… the City will need to make a recommendation to the MDEQ on how they will fully optimize their corrosion control treatment." "Samples collected at your residence of 212 Browning Avenue were not included in this compliance determination as you utilize a whole home filter." But DEQ confirmed very high lead levels, as high as 707 parts per billion in the spring, before the water main serving that residence was replaced and the situation improved."…. (O)ur office has been in contact with the Department of Health and Human Services…. And had some preliminary discussions about a public education and assistance campaign regarding household lead issues, guidance and abatement." – August 24, 2015: MDEQ's Liane Shekter Smith sends an email to MDEQ's Brad Wurfel outlining a draft email to Flint resident LeeAnn Walters,

whose high drinking water lead levels earlier in the year sparked Miguel Del Toral's sounding of alarm bells at the EPA. The Shekter Smith email indicates that Ms. Walters had a meeting in the governor's office on August 4. (Email laying out key points she intends to send to Ms. Walters, however, never actually does)

8) Before the switch to Flint River water, "Staff believed that it was appropriate to monitor for two 6-month rounds of sampling to determine if additional measures were necessary. Based on the sampling performed, the city is required to install corrosion control treatment (see August 17, 2015 letter)." "A pilot test was not required or conducted. Staff believed that it was appropriate to monitor for two 6-month rounds to determine if additional measures would be necessary."—October 15, 2015 Email from Liane Shekter Smith (MDEQ) to DEQ colleagues Brad Wurfel, Jim Sygo, and George Krisztian. (email justifying how and why the MDEQ performed their sampling of the water)

9) "… (T)his is a huge expense…. They have to figure there are approximately 30 drinking water faucets on average at each school… I suspect it's a really big number! This proposal is also disconnected from how water sampling is accomplished. Most parameters are required to be met at the plant tap (at the point the water enters the distribution system). Only a few parameters (lead, copper, disinfection byproducts, bacteria) are monitored out in the system at customer taps. Even if the proposal were to be for only lead and copper, this is a huge expense that would be placed on the supplier of water inappropriately. I understand the desire to have this kind of information, but if the legislature wants to require this monitoring, the burden for this should be on the schools or the board of education."- December 3, 2015 email response to State Representative Adam Zemke (complaining that it would be a huge cost and hassle to test schools for lead and copper and even more to test for other contaminants)

**STEPHEN BUSCH, District Supervisor assigned to the Lansing District Office of the MDEQ**

1) "One of the things we didn't get to today that I would like to make sure everyone is on the same page on is what Flint will be required to do in order to start using their plant full time. Because the plant is setup for emergency use, they could startup at any time, but starting up for continuous operation will carry significant changes in regulatory requirements so there is a very gray area as to what we consider for startup."-March 26, 2014 Email to Shekter-smith

2) "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water." - April 23, 2014 email to Wurfel

3) Defendant Busch told the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program. February 27, 2015 email to the EPA

4) Defendant Busch claimed that "almost all" homes in the pool sampled for lead in Flint had lead service lines. July of 2015

5) The second round of Flint drinking water testing showed a 90th percentile level of 11 parts per billion, almost double the prior round's results. --July 24, 2015 email to Defendant Wurfel copied to all others on the original e-mail

6) that Flint would be completing "a study (within 18 months) and are allowed a period of additional time (2 additional years) to install the selected treatment for fully optimized corrosion control."-July 24, 2015 email to Wurfel (regarding a study on corrosion control and the Flint River)

7) "[a]ll previous water quality parameter ranges would have been established for the City of Flint's wholesale finished water supplier, the Detroit Water and Sewerage Department, not the City of Flint itself. As the City of Flint has not yet established optimized corrosion control treatment, the MDEQ is not yet at the point of regulatory requirements where the range of water quality parameters would be set."- September 10, 2015 response to Dr. Yanna Lambrinidou (Admission: DEQ let Flint switch drinking water sources to the Flint River without establishing water quality parameters.)

8) "… a WQP range is only required to be established at the water treatment plant tap after the system has demonstrated optimized corrosion control treatment…. As the City of Flint water treatment plant has not yet installed such treatment or been given the designation of optimized corrosion control treatment these plant tap values have not been established."- (Defendant Busch's response reiterated his belief that Flint was not required to implement corrosion control until unacceptably high levels of lead had already appeared in the water.) -Second response to Dr. Yanna Lambrinidou September 25, 2015

9) "As indicated by Mike and Adam the city is meeting 90th percentile. Not sure why region 5 [EPA] sees this one sample as such a big deal."-February 26, 2015 email response to crooks email sent to Liane Shekter smith and Richard Benzie at MDEQ---Ms. Walters lead Levels were not a big deal…an EPA technical report would conclude that "this one sample" as Busch described it, was a very big deal, indeed…. "As indicated by the results from the Walters' home and previous EPA work, the presence of lead pipes over many years has likely resulted in the accumulation of lead in the scales within non-lead pipes downstream of the lead pipe."

10) "… there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time." -March 11, 2015, Email from Stephen Busch to Mike Prysby and Richard Benzie (all MDEQ) [contradicts the evidence pointing to the water supply as the source of the legionella]

11) "No movement from Department of Community Health/Genesee County Health Department on Legionella to my knowledge." April 6, 2015 email to Liane Shekter Smith and Richard Benzie (this is false because on March 19, 2015 Busch received an email from James Henry (GCDH) regarding all of the steps they have taken in their legionnaires investigation)

12) "… (T)here are no additional requirements for the City of Flint based on the levels of lead and copper in the current source water and the results of the lead and copper distribution monitoring… I believe this condition has been met."-April 24, 2015 email in MDEQ email chain (March 2015 Veolia report directly contradicts this)

13) "If he continues to persist, we may need Liane or Director Wyant to make a call to EPA to help address his over-reaches."-April 27, 2015 email to Pat Cook (states that they need to block Del Toral from spreading information about the corrosion control)

14) email from Jennifer Crooks (EPA) to Busch, Prysby, and Cook at DEQ on July 14… "I understand that Flint didn't get the minimum number of lead samples (100) for the second six-month monitoring period that ended June 30, so I assume Flint is collecting the remaining samples now."

   a. Busch responds a day later, "We will provide the 90th percentile when available, but at this point we do not anticipate any violations of the Lead and Copper Rule."-July 15, 2015 Stephen Busch response to Jennifer Crooks

15) "Sampling requirements look at the worst case plumbing materials. Samples must be collected in accordance with the regulatory requirements and criteria in order to be used for compliance determinations."-July 25, 2015 (MDEQ was not even sure if they were sampling from lead services lines)

16) "As there has been much interest regarding lead related to Flint drinking water, I have attached our latest letter which covers the most recent January–June 2015 monitoring period. The City is in compliance with the 15 part per billion action level for lead. Yet based on these results, the treatment cannot be deemed to provide fully optimized corrosion control treatment, and the City will need to recommend additional treatment to achieve this optimization under the Lead and Copper rule requirements established under the Michigan Safe Drinking Water Act."- August 17, 2015 email to Wurfel…(States that the City does need to implement additional treatment which directly contradicts what he was previously saying)

**PATRICK COOK, Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ**

1) "[a]s Flint will be switching raw water sources in just over one year from now, raw water quality will be completely different than what they currently use. Requiring a study at the current time will be of little to no value in the long term control of these chronic contaminants."-May 1, 2015 email to Mr. Del Toral (regarding the incoming switch to the KWA)

2) "The rules you stated below allow large systems to be considered having optimal corrosion control if they have data from two consecutive 6 month monitoring periods that meet specific criteria. (The Michigan Department of Environmental Quality Office of Drinking Water and Municipal Assistance) has not made a formal decision as to whether or not the City of Flint meets the exemption criteria or will be required to do a corrosion control study since Flint has only completed one round of 6 month monitoring. The City of Flint's second round of monitoring will be completed by June 30, 2015, and we will make a formal decision at that time…the City of Flint's sampling protocols for lead and copper monitoring comply with all current state and federal requirements. Any required modifications will be

implemented at a time when such future regulatory requirements take effect."- May 1, 2015 email to Mr. Del Toral (regarding sampling Protocols)

3) "Hi Steve – I agree, the constant second guessing of how we interpret and implement our rules is getting tiresome… Any ways, when you have a minute please give me a call so we can figure out how to respond to Miguel."-April 27, 2015 email to Busch/Prysby (agreeing with Busch about curbing Del Toral's effort of spreading information regarding the City of Flints lack of Corrosion Control)

**State of Michigan**

1) "in the process of providing a water cooler on each occupied floor, positioned near the water fountain, so you can choose which water to drink."-January 7, 2015 DTMB FACILITY NOTIFICATION (advisory regarding tap water and supplying government staff with safe cooler water)

**MICHAEL PRYSBY, MDEQ Engineer assigned to District 11**

1) the Flint River water had elevated chloride levels. He stated that "although not optimal" the water was "satisfactory." "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."-October 2014 email to Shekter-Smith and Busch (discussing General Motors' Decision to no longer use the Flint River.)

2) "a study on the Flint River as an emergency intake had been conducted in 2004." - February 6, 2014 response to EM staff (asking whether he knew if MDEQ had ever conducted a "source water assessment" for the Flint River after stating he did not know)

3) ".. given that this state building has high public traffic (Flint citizens); it was felt prudent to offer an alternative supply of drinking water to citizens entering the building."- January 12, 2015 (giving an alternative drinking water supply to citizens entering the state building)

4) "I am not aware of any source water assessment conducted for the Flint River watershed" but says he wants to confirm this information. February 6th, 2015 response to Liz Murphy Assistant to the EM (He was not aware of the 2004 "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake." The 11-year-old report itself notes that the Flint River is a very highly sensitive drinking water source that is susceptible to contamination. The fact that Prysby doesn't know of or remember this report in February 2015 raises questions about whether the report was even considered as state and local officials prepared for the switch to Flint River water in spring 2014)

5) "I recall Adam showing me a high lead/copper sample result (perhaps it was this one)… as part of the city's routine lead-copper monitoring. Adam mentioned that all other samples were below the (allowable limit… and the city will not exceed the lead allowable limit. I will confirm this. The city; however, needs to take further action to help address Ms. Walters' concern. The type of plumbing needs to be identified and sample tap location within the premise plumbing. They should offer to re-sample for PB after flushing the tap to demonstrate that flushing the tap will reduce the lead concentration. The city also needs to provide other

lead reduction strategies to Mrs. Walters."-February 26, 2015 response to EPA Jennifer Crooks emails (regarding Ms. Walters high lead levels found in her water supply)

6) "As we discussed, Flint is not practicing corrosion control treatment…"- April 24, 2015 email circulated around the MDEQ defendants (directly contradicts the MDEQ quote stating they were practicing corrosion control)

**BRADLEY WURFEL, Director of Communications for MDEQ**

1) "The ACLU has saved us the trouble of waiting on the EPA for the report… it's online at the link below… Miguel apparently asserts that the DEQ and EPA are at odds on proper protocol. Which seems weird."-July 9, 2015 email to Steve Busch at DEQ as ACLU-Michigan is breaking the story of the June 24 Del Toral memo and Michigan Radio reporter Lindsey Smith is sending related press inquiries to Wurfel. At this point MDEQ officials have clearly heard Del Toral's concerns numerous times, but they still do not have Del Toral's June 24 memo. (in response to the ACLU-Michigan breaking the Del Toral Story)

2) "Let me start here- anyone who is concerned about lead in the drinking water in Flint can relax."-July 13, 2015 Public Statement to Michigan Radio in a story headlined, "Leaked internal memo shows federal regulator's concerns about lead in Flint's water. (Regarding water quality and telling the public they can relax about the water quality stating that it was acceptable, when in fact it was not)

3) "Guys, the Flint Ministers met with the Governor's office again last week. They also brought along some folks from the community – a college prof and GM engineer – who imparted that 80 water tests in Flint have shown high lead levels. Could use an update on the January/June testing results, as well as recap of the December testing numbers, and any overview you can offer to edify this conversation?"-July 24,2015 email to Busch, prysby, Wyant and Shekter Smith (Questions Marc Edwards' water tests)

4) "Guys, here's an update and some clarification on the lead situation in Flint. Please limit this information to internal for now…By the tenants of the federal statute, the city is in compliance for lead and copper. That aside, they have not optimized their water treatment… Conceivably, by the time we're halfway through the first timeline, the city will begin using a new water source with KWA… and conceivably, the whole process starts all over again. In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an eminent health threat from lead or copper."-July 24, 2015 Email to Muchmore and Wyant (gives an update on lead situation and Stating that residents do not need to worry)

5) "[d]on't know what it is, but I know what it's not. The key to lead and copper in drinking water is that it's not the source water, or even the transmission lines (most of which are cast iron). It's in the premise plumbing (people's homes)."-August 27, 2015 Email response to Governor's Office Inquiry (regarding high lead levels in people's homes and still not blaming the water for the high lead levels, instead he places that blame on the people's homes. Dr. Hanna-Attisha's report directly contradicts this in that 10-80% of the city's water pipes have the ability to leach lead)

6) "This person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals…"- August 27 2015, Wurfel response to Mike Brown. Brown inquired: "So this resident's lead levels are much higher than the 90th percentile mentioned in the previous email. What is the discrepancy?" (Response to Ms. Walters pipes being made out of plastic and a further attempt to discredit Del Toral)

7) "Bottom line is that folks in Flint are upset – because they pay a ton for water and many of them don't trust the water they're getting – and they're confused, in no small part because various groups have worked hard at keeping them confused and upset. We get it. The state is trying like mad (to) get the word out that we're working on every aspect of the health safety of local water that we can manage, and the system needs a lot of work… (I)t's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed." August 27, 2015, Wurfel response to Mike Brown. Brown inquired: "So this resident's lead levels are much higher than the 90th percentile mentioned in the previous email. What is the discrepancy?" (Wurfel Response to Ms. Walters pipes being made out of plastic and a further attempt to discredit Walters)

8) "[W]e want to be very clear that the lead levels being detected in Flint drinking water are not coming from the treatment plant or the city's transmission lines… The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes…. the results reported so far fail to track with any of the lead sampling conducted by the city. In addition, Virginia Tech results are not reflected by the blood lead level testing regularly conducted by the state department of community health that have not shown any change since Flint switched sources."-September 2, 2015: MDEQ's Brad Wurfel responds to Virginia Tech revelations with more deflection and denials in a press release emailed to MLive.com reporter Ron Fonger. (Discrediting Marc Edwards and continuing to deny that lead was coming from the untreated water going through the WTP and the Flint Transmission lines)

9) "The samples don't match the testing that we've been doing in the same kind of neighborhoods all over the city for the past year. With these kinds of numbers, we would have expected to be seeing a spike somewhere else in the other lead monitoring that goes on in the community."-September 6, 2015 Another DEQ denial in a quote from Brad Wurfel aired/published by Michigan Public Radio regarding the Virginia Tech lead testing results (attempt to discredit Edwards on Michigan Public Radio; continued denial that the water that was untreated for corrosion running through the city's transmission pipes was the cause of the lead)

10) "[T]he state DEQ is just as perplexed by Edwards's results as he seems to be by the city's test results, which are done according to state and federal sampling guidelines and analyzed by certified labs."-September 9, 2015 Email from Brad Wurfel (MDEQ) to Ron Fonger at MLive questions Marc Edwards' conclusions (This reasoning does not include such important things as: 1) Del Toral's longstanding concerns about the sampling methods in Flint; and, 2) The fact that the number of lead samples in Flint actually decreased after Del Toral first made his lead concerns known to MDEQ, with state approval, from 100 in the

first six-month test to 60 in the second six-month test. Later, investigators conclude that the city's sampling procedures were flawed. Ultimately, in January 2016, the EPA announces it will take over lead sampling and monitoring in Flint.)

11) "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly." -September 9, 2015 Email from Brad Wurfel (MDEQ) to Ron Fonger at MLive questions Marc Edwards' conclusions (this assertion completely ignores the controversy and explicit Del Toral warnings over corrosion control and sampling methods that has long brewed between EPA and DEQ.)

12) "We're confident with what we've done, but we know there are concerns."- September 25, 2015 Detroit Free Press publishes a report about Hanna-Attisha's revelations and quotes MDEQ's Brad Wurfel with yet another defense/deflection. (still expressing confidence in the sampling methods the MDEQ was using and the work they had done up until that point)

13) the Flint situation is turning into "near hysteria," and saying of Dr. Hanna-Attisha's statements "I wouldn't call them irresponsible. I would call them unfortunate." "Flint's drinking water is safe in that it's meeting state and federal standards. The system has an aging portion that needs to be addressed. They haven't had meaningful maintenance for four decades or more." - Associated Press publishes another quote attributed to MDEQ's Brad Wurfel in response to Dr. Hanna-Attisha's statements on September 28, 2015 (He again declares Flint's water safe and tries to further discredit the Hurley studies.)

14) "In December, our staff became peripherally aware that the hospitals in Genesee were seeing an uptick in Legionnaires cases." "Legionnaires is a water-borne illness. It essentially is a type of pneumonia caused by bacteria… Untreated, it can be deadly… More than 40 cases reported since last April. That's a significant uptick – more than all the cases in the last five years or more combined." "County Health Departments are supposed to perform epidemiological tracebacks on all confirmed cases of this disease, locate the source and address it. Genesee County Halth has not done this work as of November. At a January meeting with area hospitals, MDCH, DEQ and others, Nick Lyon reportedly directed the county health folks, in terms not uncertain, to get this done as a priority. As I'm sitting here today, it still is not done to my knowledge." "My counterparts at MDCH informed me today that they cannot step in unless they are invited or unless the outbreak is multi-county. They've not been invited until, I believe, today. That may be in part because of the email string and letter I've enclosed here, which was unknown to MDCH until I shared it over to them." "Essentially, Jim Henry with Genesee County Health is putting up the flare. He's made the leap formally in his email that the uptick in cases is directly attributable to the river as a drinking water source – this is beyond irresponsible, given that it is his department that has failed to do the necessary traceback work to provide any conclusive evidence of where the outbreak is sources, and it also flies in the face of the very thing a drinking water system is designed to do."-March 13, 2015 email to Harvey Hollins, an aide to Governor Rick Snyder (States that blaming the river for the legionella outbreak is irresponsible)

15) "Legionnaires is NOT among the 90 water contaminants screened in the Safe Water Drinking Act, but in the absence of action by county health, our staff are now considering

taking samples from various points in the system and working with DCH's lab to test for it, if for no other reason than to rule it out."-March 13, 2015 email to Harvey Hollins, an aide to Governor Rick Snyder. (While technically true that the SDWA does not specifically state legionella; Legionella control is covered by the Surface Water treatment rule that is an EPA administrative rule promulgated under the authority of the SDWA)

**Michael Brown**

1) "It is understood that Flint will be exempt from any payment involved in the final 'go/nogo' engineering study that will be performed to determine final costs and details of the Karegnondi project," "It is agreed that the City of Flint will have 60 days to review the final engineering report prior to signing the actual KWA master contract."—February 13, 2012 Brown's letter to Jeffrey Wright Genesee County Drain Commissioner. http://www.freep.com/story/news/local/michigan/flint-water-crisis/2016/06/22/flint-em-committed-join-kwa-year-before-council-vote/86222140/

**DARNELL EARLEY, Flint's Emergency Manager from October of 2013, until January of 2015**

1) "[w]e expect that the Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination. In that case, there will be no need for Flint to continue purchasing water to serve its residents and businesses after April 17, 2014."-March 7, 2014 letter to DWSD (Regarding Water Treatment Plant capabilities) http://mediad.publicbroadcasting.net/p/michigan/files/201512/earlely_letter.pdf

2) He asserted that the tragedy was caused by local leaders, ignoring the MDEQ's role and the fact that he and his fellow Emergency Managers had entirely usurped local authority at Governor Snyder's direction. "This was a local decision that was made by local civic leaders. Anyone who says otherwise is being disingenuous." October 26, 2015, the Detroit News published an audacious column from Defendant Earley entitled "Don't blame EM for Flint water disaster." http://www.detroitnews.com/story/opinion/2015/10/26/opinion-flint-water-disaster/74657458/ (Earley writes this despite the fact that then-State Treasurer Andy Dillon made the "ultimate decision" to switch from DWSD, state-appointed emergency manager Ed Kurtz hired an engineering firm to figure out how to use the Flint River as a primary water source, and Earley himself penned the letter to DWSD saying Flint was switching water sources to the Flint River.)

**GERALD AMBROSE, Flint's Emergency Manager from January of 2015, until April 30, 2015**

1) "[i]f $12 million annually were available for discretionary use, it would be far better spent reducing rates (which were the highest in the nation) paid by Flint customers and/or

modernizing the City's system." "[t]he oft-repeated suggestion that the City should return to DWSD, even for a short period of time, would, in my judgment, have extremely negative financial consequences to the water system." --March 3, 2015, memorandum to the Michigan Department of Treasury (As reported in the Michigan Department of Treasury Flint Water Timeline, September 2015.) A March 24 MLive.com report provides more context: "Ambrose has said the cost of water in Flint would likely rise 30 percent or more if the city returned to buying it from the city of Detroit for one year. 'If $12 million annually were available for discretionary use, it would be far better spent reducing rates paid by Flint customers and/or modernizing the City's system,' Ambrose's statement today says." (The memo claims that reconnecting to DWSD would cost at least ten (10) million dollars per year, with bills as high as one (1) million dollars per month.)

2) "The current controversy surrounding the provision of water, and the path for resolution, has a potentially significant impact on the progress that is being made. I am satisfied that the water provided to Flint users today is within all MDEQ and EPA guidelines, as evidenced by the most recent water quality tests conducted by MDEQ. We have a continuing commitment to maintain water safety and to improve water quality, and have dedicated resources to assure this commitment will be made."-March 3, 2015 memo to Deputy State Treasurer Wayne Workman

3) "It is incomprehensible to me that (seven) members of the Flint City Council would want to send more than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint"-March 24, 2015 Veto of City Council vote to reconnect to DWSD http://www.mlive.com/news/flint/index.ssf/2015/03/flint_emergency_manager_calls.html

4) "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality… water from Detroit is no safer than water from Flint."-March 24, 2015 Veto of City Council vote to reconnect to DWSD (This proves to be an extremely inaccurate statement once the crisis came to a head later in 2015) http://www.mlive.com/news/flint/index.ssf/2015/03/flint_emergency_manager_calls.html

## DAYNE WALLING, elected mayor of the City of Flint

1) "It's regular, good, pure drinking water, and it's right in our backyard."-April 25, 2014 televised Public Statement Regarding the Switch to the Flint River

2) "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."-Mid 2014 Response to complaint coming in regarding the water after the switch to the Flint River. Statement to MLive.com (it was not a safe product)

3) 'The governor and the (state) treasurer to their credit recognized it was important for the city's elected representatives to be included in the decision about the long-term source (of water) because we would be living with it,' he said. "But once the decision was made in April 2013, it become an operational issue … and I wasn't directly involved… I wasn't directly involved in the city's (decision) to use the Flint River as a source… It's now clear that the challenge was underestimated." Walling blamed the Detroit Water and Sewerage

Department for terminating Flint's contract to purchase Lake Huron water while the KWA pipeline is under construction. 'I do think it bears repeating that it was DWSD that terminated the contract with the city of Flint,' he said. 'DWSD put the city of Flint in a difficult position when they terminated that contract we had for decades and decades … My goal had always been to have a cooperative relationship with DWSD but every opportunity that was looked at ended with a barrier.'"-January 23, 2015 interview with MLive.com

4) States that The July apology email to him from EPA region 5 administrator Susan Hedman and ongoing internal review of Del Toral's June 24 memo was part of the customary organizational process September 8, 2015 email response to Marc Edwards (who was speaking about the validity of Mr. Del Toral's research). (Walling essentially makes it seem like he had no idea this was going on)

5) "I have searched myself over and over on this. I don't know what more I could have done given the guidance coming from EPA and DEQ and subsequently city staff but this major health issue did come up anyway and our community is paying a huge price. As the press conference is put together, it is necessary in my mind that we provide an explanation for how this happened and outline the steps that ensure it will never happen again."-September 30 email to Dan Wyant in response to Friar Phil Schmitter fiercely criticizing him for his declarations that the Flint River Water was safe. (Trying to pass along the blame off of himself and not admitting that he was part of the Flint River Water decision process and subsequent crisis)

## HOWARD CROFT, Flint's Department of Public Works Director

1) "The test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect. We are proud of that end result."-Press release on April 25, 2014 regarding the switch to Flint River Water (The testing being used was flawed, and the water was not safe and not by any means high quality, it was not even close to the quality of water the City of Flint was getting from DWSD)

2) "I am pleased to report that the City of Flint has officially returned to compliance with the Michigan Safe Drinking Water Act and we have received confirming documentation from the DEQ today…Recent testing has raised questions regarding the amount of lead that is being found in the water and I wanted to report to you our current status. At the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the DEQ. It was determined that having more data was advisable prior to the commitment of a specific optimization method. Most chemicals used in this process are phosphate based and phosphate can be a 'food' for bacteria. We have performed over one hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."- September 3, 2015 email from Croft to numerous city officials, including Flint Mayor Dayne Walling. (Stating that the City of Flint had returned

to compliance with Michigan's safe drinking water act; samples taken were insufficient to draw any conclusions)

## MICHAEL GLASGOW, water treatment plant operator for the City of Flint

1) "expecting changes to our Water Quality Monitoring parameters, and possibly our Disinfection Byproduct monitoring on lead & copper monitoring plan… Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible… I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water."-April 16, 2014 letter/email to Adam Rosenthal at MDEQ regarding the Water Treatment Plant startup and distribution of water

2) "assumed there would be dramatic changes to our monitoring. I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."-April 17, 2014 Email warning to MDEQ, Prysby, and Busch regarding the plan and concerns to distribute water

## EDEN WELLS, Chief Medical Executive within the Population Health and Community Services Department of the MDHHS

1) "Agree," (showing MDHHS continuing efforts to mislead the public, protect itself, and discredit Dr. Hanna-Attisha.) -September 29, 2015 email response to Linda Dykema Corinne Miller, Sara Lyon-Callo regarding Linda Dykema's email about a data war

2) The state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public. -September 29, 2015 response to Dr. Hanna Attisha emailing her directly

3) "I certainly understand your role and the need to address the problem you identified; as physicians, our ethical and professional vows to care for and prevent harm to our patients is paramount. No need for data wars – I think we are all just trying to be sure, as you and I said earlier, that we are comparing the same data the same way – 'apples to apples.'"-September 29, 2015 email response to Dr. Hanna-Attisha (dismissing the state data inadequacies)

## LINDA DYKEMA, director of the MDHHS Division of Environmental Health

1) September 29, 2015 Linda Dykema responds to Corinne Miller, Sara LyonCallo and Eden Wells: "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." (This quote shows the continued efforts in opposing and resisting of acceptance outside studies that have been performed.)

2) "The DEQ has not seen a change in the city's compliance with the lead rule since switching to the Flint River source." "Regarding the EPA drinking water official quoted in the press articles, the report that he issued was a result of his own research and was not reviewed or approved by EPA management. He has essentially acted outside his authority."- July 23, 2015 email summarizes her conversation with Busch

3) It appears that the researchers have completed testing of a lot of water samples and the results are significantly different than the city and DEQ data. It also appears that they've held public meetings in Flint, resulting in concerns about the safety of the water that have arisen in the last few days."-September 22, 2015 email (MDHHS officials finally addressing the Edwards report findings which was 11 days after they had originally been published)

4) "It would appear that the Hurley physicians are looking just at younger children, rather than 0-16"—September 25, 2015 email (Previous MDHHS analyses of the Flint lead situation were looking at the same age range, using this to discredit the Hurley study. However, the MDHHS studies were not using data from specific zip codes.)

**<u>NANCY PEELER, MDHHS employee in charge of its childhood lead poisoning prevention program</u>**

1) "We compared lead testing rates and lead testing results to the same time frame for the previous 3 years, to see if there were any patterns that suggested that there were increased rates of lead poisoning after water supply was switched… There was a spike in elevated blood lead tests from July-September 2014 (chart on left, gold line)…. However that pattern is not terribly different than what we saw in the previous three years… (W)e are working with our epidemiologist to statistically verify any significant differences… We commonly see a seasonal effect with lead, related to people opening and closing windows more often in the summer, which disturbed old deteriorating paint on the windows… We suspect that the summer spike may be related to this effect… If the home water supply lines and/or river water were contributing to elevated blood lead tests, we expected that the increased rates would extend beyond summer, but they drop quite a bit from September to October, stayed low over the winter, and are just starting to tail up again in the spring of 2015…" "So, upon review, we don't believe our data demonstrates an increase in lead poisoning rates that might be attributable to the change in water for Flint." A MDHHS chart accompanying Peeler's email clearly states… "Based on the results… positive tests for elevated blood lead levels were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014…. However, it's important to note that the purpose of control charts is to monitor data for quick detection of abnormal variation – not to construct a case for causality."- July 28, 2015 detailed response to the July 22

departmental inquiry precipitated by the email of the governor's chief of staff, Dennis Muchmore. (Trying to falsely discredit that the data on blood lead levels were due to the switch to the Flint River)

2) E-mail admitting an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014, but attributing it to seasonal variation. July 28, 2015 email to MDHHS officials (It was not seasonal variation but, an increase of lead leaching into the water from the pipes being corroded by said water)

3) "My secret hope is that we can work in the fact that this pattern is similar to the recent past."-in response to and the Day after Dr. Hanna-Attisha released her study. September 25, 2015 MDHHS's Peeler tasks Robert Scott with responding to Free Press reporter Kristi Tanner.  (They were trying anyway to discredit Dr. Hanna-Attisha's data.)

4) "The email you received could be read as an intent to escalate and spin things, and I don't think you need to get caught up in that."-September 24, 2015 email to Robert Scott who is drafting a response to an email to Marc Edwards. Response to the request for comments on draft email from Scott to Edwards

5) "Based on questions coming through, I do think we need to run our Flint charts for the same population group that the Flint docs ran (as close as we can approximate the sample) but I'd look at it across the five years again. Depending on what our charts show, we may want to consider having (state epidemiologists) help us run an analysis more like the docs ran – but let's look at the revised charts as a starting point."--- September 23, 2015 email to MDHHS regarding Dr. Mona Hanna-Attisha's inquiries and date

## ROBERT SCOTT, Data Manager for MDHHS's Healthy Homes and Lead Prevention Program

1) "While the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall.'"- September 25, 2015 an email from Scott to Angela Minicuci at MDHHS regarding responding to Free Press reporter Kristi Tanner (misrepresenting the trend of the spike in blood lead levels)

2) "I said this morning I'd look to see if the distribution of (elevated blood lead levels) in the July-September 2014 'spike' was any different from the typical distribution of (elevated blood lead levels) in Flint. I compared totals by zip code vs. totals by zip code from 2010 (of blood lead levels greater than five micrograms per deciliter). The pattern is very similar and is further evidence, I think, that the water was not a major factor here."- July 28, 2015 email to MDHHS officials (Falsely states that the lead levels followed a pattern and were seasonal)

3) attaches a spreadsheet to the email, says he has attempted to "recreate Hurley's numbers," and says he sees "a difference between the two years (presumably pre- and post-water switch), but not as much difference as (Hurley) did." "I'm sure this one is not for the

public."-September 24, 2015 email to Nancy Peeler (Starting to admit their methodology is wrong but not completely and stating that this should not be disclosed to the public)

4) "As you well now, the data you and Dr Hanna-Attisha are requesting are derived from personal health data, which of course is confidential… I worked with you earlier this month to get data to you relatively quickly but did not manage to complete the process before I went on annual leave for several days. I neglected to inform you that I'd be away, and I apologize for not informing you."-September 24, 2015 Draft email response to Marc Edwards which he sends to Nancy Peeler (draft response to Edwards regarding providing data to him, sends this email to Peeler for revisions)

**The City of Flint**

1) "The city mails a notice to its customers saying it is in violation of the Safe Water Drinking Act due to elevated presence of trihalomethanes" – a byproduct of disinfecting the water. **January 2, 2015 City Notice to Residents of Flint**

2) "The City of Flint is issuing a Lead Advisory for residents to be aware of lead levels in drinking water after hearing concerns from the medical community. While the city is in full compliance with the Federal Safe Drinking Water Act, this information is being shared as part of a public awareness campaign to ensure that everyone takes note that no level of lead is considered safe."-September 25, 2015 Health Advisory to Residents of the City of Flint telling them to flush pipes and install filters

**LAN**

1) 26-JUN-2013 — With the approval of Flint's CLO Bade and Finance Director Ambrose, EM Ed Kurtz hired Lockwood, Andrews & Newnam, Inc. engineers (LAN) on a sole-source contract to plan switch-over to Flint River through Flint Water Plant. Fee: $171,000. LAN is a subsidiary of national consulting firm Leo A. Daly, based in Texas.

2) Analysis indicates that the cost of supplying water from the Flint River on a continuous basis will be greater than the proposed KWA Raw Water Supply Contract, but less than continued supplied from Detroit. --2011 Feasibility report

3) Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron. As an example, the temperature of water supplied to customers during the summer will be warmer than the present Lake Huron supply, because of the increased summer temperature in the relatively shallow river. —2011 Feasibility report (this is not the only aesthetic that would change with use of the Flint River)

4) November 26, 2014 Report on Triomalomethane Formation Concern. No mention of corrosivity or lead problems.
   a. Other than total Coliform, the Flint River characteristics do not appear to have changed significantly over the past 10+ years
   b. Under the treatment process section, it states nothing regarding corrosion control

      c. No data in the report on the age and size of the current distribution piping system

      d. Only points to disinfectant demand and the use of flushing and cast iron pipes (cast iron pipes would be a problem because iron pipes can become corroded when subject to highly corrosive water)

5) February 27, 2015 report on Triomalomethane Formation Concern. No mention of corrosivity or lead problems

      a. Recommended that the City hire a third party water quality expert to complete an independent 'water audit'—(why the City of Flint hired Veolia)

      b. The Flint River characteristics do not appear to have changed significantly over the past 10+ years.

      c. Under treatment process, it states nothing regarding corrosion control

      d. Only discusses leak in sewer as potential cause of total coliform count

      e. Under the infrastructure portion of the report, the piping is stated to be 70% cast iron, 20% ductile iron, 2% concrete, and 8% steel. This says that none of the pipes contain lead.

      f. Even though the piping is aging, the report does not call for a replacement of the pipes. Call for flushing the pipes to reduce time the water spends in such pipes but not for replacement of the pipes.

      g. Does state that unlined cast iron pipe can become pitted, which allows for colonization site of bacteria such as TTHM. However the report does not discuss how the cast iron pipes become pitted.

6) August 27, 2015 report on Triomalomethane Formation Concern. No mention of corrosivity or lead problems.

      a. The Flint River characteristics do not appear to have changed significantly over the past 10+ years.

      b. Continuing to use data collected in 2014 for 2015 reports

      c. Only discusses a leak in the sewer that may have been impacting total coliform count.

      d. Under treatment process it states nothing regarding corrosion control.

      e. Under the infrastructure portion of the report, the piping is stated to be 70% cast iron, 20% ductile iron, 2% concrete, and 8% steel. This says that none of the pipes contain lead.

      f. Even though the piping is aging, the report does not call for a replacement of the pipes. Call for flushing the pipes to reduce time the water spends in such pipes but not for replacement of the pipes.

7) The reports call for more disinfection. Disinfection is achieved by feeding chlorine into the water. Chlorine kills the coliform that are in the water however it makes the water extremely corrosive. None of the reports produced by LAN state a requirement for corrosion control technology. This is in direct contradiction with the LCR produced by the EPA. A corrosion control study needed to be done before the flint river could be used as a water source. All of the engineering report state nothing regarding corrosion control technology

8) Additionally, all of the reports produced by LAN seem to have the exact same information. This is true starting from the 2013 – 2015 reports. It seems that they were copying all of their old data from their first initial report in 2013 (refuting the TYJT report).

**ROWE**

1) 2009 Study by LAN and Rowe for the KWA. Section 7.2.4 discusses the use of the Flint river before the 1965 switch to the DWSD and the proposed use of the Flint River 2009-on. Sets forth proposed modifications for full time operation and treatment of Lake Huron and Flint River water. Modifications proposed:
    a. Piping and metering to deliver raw water******
    b. Power upgrades, including emergency/backup power
    c. Disinfections upgrades
    d. Chemical feed systems
    e. Finished Water Pumping
    f. Updated controls and monitoring
    g. Added security measures

2) July 2011 report stating that the KWA and interim Flint River water is the most cost effective option for Flint

3) When the cost of upgrades to the WTP and the increased operating costs (for softening) are added to the TYJT analysis, the KWA option is less than the DWSD 8 mgd option. – 2013 report rebutting TYJT study

4) Water from the river will require greater effort to treat than water from Lake Huron (more chemicals, power, and residuals). The TYJT analysis shows about the same O&M costs for the Flint WTP, regardless of water source. It seems that the WTP O&M costs for the KWA options should be reduced to reflect the savings from treating Lake Huron water. -- 2013 report rebutting TYJT study

5) Flint's WTP as a backup to the KWA will be less difficult to provide for than the current arrangement as a backup to DWSD. We believe there is potential for challenges with chemistry and treatment for the proposed DWSD blending options, too. -- 2013 report rebutting TYJT study

6) If any of the "blending" options are chosen, it will be necessary to upgrade the Flint WTP and dams to provide reliable, continuous service and compliance with recent surface water treatment regulations. -- 2013 report rebutting TYJT study

7) The majority of the improvements at the plant have been implemented as a result. The plant is generally ready for use in a standby capacity, in the event that service from the City of Detroit water supply is interrupted. Long-term plans include provisions for expanding the capacity of the plant and implementing a softening system- 2013 Water Reliability report--2013 report rebutting TYJT study

8) 07-SEP-2011 — Report to Flint City Council by Rowe Professional Services determined buying water from Karegnondi Water Authority (KWA) cheaper than continuing to purchase from Detroit Water and Sewerage Department (DWSD), or using Flint River water as upgrades to Flint treatment equipment required would cost $50 million.


**VEOLIA**

1.      Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." --interim report presented to a committee of Flint's City Council on February 18, 2015

2.      the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." --interim report presented to a committee of Flint's City Council on February 18, 2015

3.      "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality." --interim report presented to a committee of Flint's City Council on February 18, 2015

4.      "[m]edical problems… …[s]ome people may be sensitive to any water." --interim report presented to a committee of Flint's City Council on February 18, 2015

5.      "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." -- final "Water Quality Report" dated March 12, 2015.

6.      "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations." -- final "Water Quality Report" dated March 12, 2015.

7.      "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements." -- final "Water Quality Report" dated March 12, 2015.

8.      "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration." -- final "Water Quality Report" dated March 12, 2015.